# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| RESTEM, LLC <br><br>       Plaintiff, <br><br> v. <br><br> NEUVIAN LLC, JACOB MIGUEL, and <br> SPENCER BOUHADIR, <br><br>       Defendants. | **Case No. 1:25-cv-20229-DSL** |

## DEFENDANTS' RULE 11 MOTION FOR SANCTIONS

Defendants, Neuvian, LLC ("Neuvian"), Jacob Miguel, and Spencer Bouhadir (collectively, "Defendants"), by and through the undersigned counsel, and pursuant to Federal Rule of Civil Procedure 11 and this Court's inherent powers, respectfully request that this Court dismiss the Complaint and impose sanctions against Plaintiff, Restem, LLC ("Plaintiff" or "Restem"), Plaintiff's Chief Commercial Officer Brian Pla, Plaintiff's Chief Development and Scientific Officer Rafael Gonzalez, PhD., Plaintiff's attorneys (*to wit*: Kenneth G. Parker, Esq., David B. Clark, Esq., Daniel Lammie, Esq., Kevin C. Kaplan, Esq., and Amanda M. Comas, Esq.), and their attorneys' law firms (*to wit*: **HAYNES AND BOONE, LLP,** 600 Anton Blvd., Suite 700, Costa Mesa, California 92626, and **COFFEY BURLINGTON, P.L.**, 2601 South Bayshore Drive, Miami, Florida 33133), for failing to conduct an adequate pre-filing investigation prior to filing the Complaint for federal and state trade secret misappropriation, correction of inventorship, declaratory judgment of patent ownership, and false advertising, and/or for otherwise filing a frivolous lawsuit against Defendants.

1

## INTRODUCTION

The instant Complaint is yet another product drafted in a deceptively conclusory manner in hopes of surviving initial scrutiny, and is, once again, strategically crafted to obscure its fatal flaws from the Court.[1] Like its earlier pursuit in the *Congela Litigation*, however, this effort is doomed from the outset as the irrefutable facts completely dismantle any plausible basis for this lawsuit. Indeed, such fatal facts are, here too, all supported by unambiguous and unavoidable evidentiary documents, all of which were well known to Plaintiff Restem, its Chief Commercial Officer Brian Pla, its Chief Development and Scientific Officer Rafael Gonzalez, and all of which were readily, quickly and easily ascertainable by counsel through even the most fundamentally basic cursory investigation. Simply put, the claims advanced by Plaintiff and its counsel in this litigation are completely baseless, undeniably devoid of evidentiary merit or support, and, once again, are entirely frivolous. Dismissal and sanctions are appropriate.

As detailed below, Restem's Chief Commercial Officer, Brian Pla, was formerly in business with Defendant Jacob Miguel where they jointly operated a company known as Eternus Bioscience, LLC. At the time, Rafael Gonzalez was a contracted consultant for Eternus and he assigned all intellectual property under a written consulting agreement with and to Eternus. When Miguel and Pla ended their business relationship in 2023, they executed a Membership Interest Purchase Agreement, under which Miguel transferred his ownership interest in the Eternus business to Pla. In that same Agreement, Pla agreed to transfer by Assignment to Miguel's company, CIM Holdings, ***all* of Eternus' Intellectual Property,** which would include anything

---

[1] On the same day this litigation was filed, Plaintiff's counsel filed a separate lawsuit on behalf of another one of Brian Pla's companies – *to wit*, Congela Biocosmetics, LLC – against Defendant Jacob Miguel and his company, The CIM Holdings Group, LLC, based on claims of trademark ownership. *See Congela Biocosmetics, LLC v. The CIM Holdings Group, LLC and Jacob Miguel*, Case No. 1:25-cv-20230-DSL (hereinafter the "*Congela Litigation*"). Miguel and CIM Holdings prepared and served a Rule 11 Motion in the *Congela Litigation* similar to the instant one here.

relating to the subject matter of the patent at issue, U.S. Patent No. 11,878,036 ("the '036 Patent"). Crucially, Pla himself signed this agreement both personally and in his corporate capacity. Pla also signed the separate, formal Assignment of Intellectual Property to finalize the transfer of rights to CIM Holdings.

Despite these indisputable facts, the Complaint deliberately omits any meaningful acknowledgment of the Membership Interest Purchase Agreement—referencing it only in passing—and conspicuously excludes any mention of the specific and controlling related language therein transferring **_all_** Eternus intellectual property to Defendant Miguel's company CIM Holdings, nor the related, executed Intellectual Property Assignment. These calculated omissions underscore the inescapable knowledge that the Complaint lacked <u>any merit</u> before its filing. In reality, this lawsuit, just like the *Congela Litigation*, is built on a foundation of misrepresentation, falsehoods and the suppression of dispositive facts. It has no legal or factual basis, is patently frivolous, and should never have been filed. Dismissal and sanctions are warranted.

## **FACTUAL BACKGROUND**

At the outset, it is important to understand the overlapping and close relationships between Plaintiff Restem and various other entities mentioned throughout the Complaint. Specifically, *other than* the named defendants, CIM Holdings, LLC, and Cellexo, LLC ("CIM Holdings," and "Cellexo" are both owned by Defendant Jacob Miguel), **Brian Pla** is either an owner or a high-level (if not controlling) executive of **_every_** other company directly or indirectly involved in this litigation, *to wit*: Plaintiff Restem, LLC ("Restem" – **Brian Pla** is its **Chief Commercial Officer**); Eternus Bioscience, LLC ("Eternus" – **Brian Pla** is its sole **Managing Member**); Semper Iuvenis, LLC ("Semper" – **Brian Pla** is its **Owner**); and Blue Zone Holdings, LLC ("Blue Zone" – **Brian**

**Pla** is its **Owner**, through Semper).[2] *See* **Composite Exhibit A**. Brain Pla's close relationship with each of the foregoing entities is an important and revealing fact, as he (and, thus, by extension all of the foregoing entities, including Plaintiff Restem), is well aware that the alleged intellectual property at issue was unequivocally contracted to be assigned and actually assigned to Defendant Jacob Miguel's company, CIM Holdings, ***via written contract and transfer documents executed by Brian Pla himself***. This reality is fatal to Restem's pursuit *sub judice*; so, instead of confronting it, the Complaint masterfully attempts to sidestep the foregoing agreements while, simultaneously and deceptively implying that *other* agreements exist to buttress the claims in suit. Tellingly omitted from the Complaint, however, are *any* exhibits to corroborate the existence of *any other relevant agreement or document.*

Indeed, although Restem loosely claims that it was *the* company guiding the "research efforts for the treatment of GSM," and that Rafael Gonzalez worked for Restem at all times material to the Complaint and assigned all of his inventions to Restem, [*see, e.g.,* ECF 1, at ¶15, 60, 61, 69, 70], Restem does not attach a single agreement or document to the Complaint to corroborate any of these assertions. Likewise, although Restem makes the additional conclusory assertion that information was given by it to Eternus and Miguel "with the clear understanding and agreement that such information was to be treated as confidential," [*see, e.g.,* ECF 1, at ¶17], no documents are attached to the Complaint to even suggest Restem's involvement on any level, or to suggest the existence of *any* agreement between Restem and any of the Defendants in the relevant time period. These glaring omissions come as no surprise to Defendants as such agreements simply do not exist. Rather, the ***only*** agreement with Rafael Gonzalez (who Restem claims to be an inventor of the subject matter of the '036 Patent) during the time in question is a

---

[2] The foregoing entities are referenced, *inter alia*, in Para. 16 of the Complaint. [ECF 1, at ¶16].

Consulting Agreement he entered into with Eternus on January 15, 2022. *See* **Exhibit B.** This Consulting Agreement was entered into and executed by Rafael Gonzalez *in his personal capacity* (*i.e.,* ***not as an employee or contractor of any other entity***), as illustrated below:



**Exhibit B**, at pp. 1, 6 (emphasis added). This Consulting Agreement defined the scope of Rafael Gonzalez's consulting services very broadly, as follows:

> 1.   **Engagement; Consulting Services.**  The Company hereby agrees to retain Consultant to act as a consultant to the Company and Consultant agrees to accept such engagement and to provide to the Company the following consulting services: (i) the establishment of a cosmetic lab, (ii) the formulation of cosmetic products, (iii) the promotion of cosmetic products, and (iv) such other consulting services as mutually agreed to by the parties (collectively, the "Consulting Services").

**Exhibit B,** at §1 (emphasis added). And, like most consulting agreements of this nature, the foregoing Consulting Agreement executed by Rafael Gonzalez (in his individual capacity) included a very broad provision expressly declaring ***the ownership of all intellectual property*** (in whatever form it should take) that was previously or to be created, discovered, invented, or otherwise learned by Rafael Gonzalez to the extent relating to the business and processes of Eternus, automatically transferred to and were owned by Eternus.  Specifically, said Work Product provision expressly provided:

> (c)   Work Product.   All ideas, inventions, products or otherwise, relating in any way to the Company's business or processes, designed, improved, planned, proposed, altered, modified, refined or enhanced by Consultant ("Work Product") shall be considered "work made for hire" to the fullest extent permitted under applicable federal and Florida law and shall remain at all times the sole property of the Company.   Consultant shall not be allowed to use in any manner whatsoever, for his or its own or any other person's or entity's benefit, such Work Product unless he or it receives the prior written consent of the Company.   Any and all patents, patent filings, trademarks, copyrights or the like relating in any way to the Company's products and the Work Product shall remain the sole property of the Company and, upon request, Consultant shall execute any and all documents, filings or contracts assigning the same to the Company. Furthermore, whenever requested to do so by the Company, Consultant will execute any and all applications, assignments or other instruments that Company deems necessary to protect the Company's interests therein. Consultant's obligations hereunder shall survive the termination of Consultant's engagement with respect to Work Product conceived or made by Consultant during the term of Consultant's engagement described in this Agreement.

**Exhibit B**, at §8(c) (emphasis added). Notably, the foregoing clause expressly prevents Rafael Gonzalez from using "in any manner whatsoever, for his or its own *or any other person's or entity's benefit*, such Work Product…" *Id*. (emphasis added). This express prohibition thus directly contradicts the knowingly false assertions in the Complaint suggesting that Rafael Gonzalez was somehow contemporaneously secretly contracted and employed by Restem as a consultant for the exact same subject matter. In fact, as the following "Representations and Warranties" confirm, Rafael Gonzalez expressly affirmed that he was not under *any* other contractual relationship or obligation that would have potentially interfered with the Consulting Agreement as a whole, including the breadth and scope of the above quoted Work Product provision:

> 7.   **Representations and Warranties of Consultant.**   Consultant represents and warrants to the Company that he is under no contractual or other restriction or obligation, which would prevent the performance of his duties hereunder or interfere with the rights of the Company hereunder.

**Exhibit B,** at §7 (emphasis added). Here, again, the evidence (*readily available pre-suit to Plaintiff, its executives and its counsel*), undeniably establishes that Rafael Gonzalez represented and warranted that he was ***not*** employed by Restem (or any other entity) during the period in

question, and the reality is that he was working under the foregoing Consulting Agreement with Eternus, and all intellectual property developed thereunder by him (if any at all) was automatically transferred and owned by Eternus.[3]

Against the foregoing backdrop, it becomes unmistakably clear why Restem intentionally omitted substantive reference to the Membership Interest Purchase Agreement (the "MIPA") memorializing the end of Pla's and Miguel's relationship and the transfer of the Eternus Intellectual Property to CIM Holdings, LLC, as the MIPA irrefutably transferred the benefits under Rafael Gonzalez's Consulting Agreement, whatever the benefits may have been, to CIM Holdings. More specifically, on March 17, 2023, several parties involved in this case, ***including Brian Pla in his individual capacity***, were involved with the negotiation, preparation, and execution of the MIPA. The MIPA evolved from Cellexo's foreclosure *against* Pla and his other company, Semper, upon Semper and Pla's default under a Secured Promissory Note.[4] Such foreclosure resulted in Cellexo becoming the 100% sole owner of the company Blue Zone. *See* MIPA at 1, ¶ 4, attached hereto as **Exhibit C.** Importantly, at the time, Blue Zone was the 100% sole owner of Eternus, and Eternus was the only party to the above-described Consulting Agreement with Rafael Gonzalez, and, thus, the sole recipient of the Work Product provisions and benefits thereunder. *See* **Exhibit B,** at §§1, 8.

As part of the negotiated agreed upon exchange under the MIPA, Cellexo allowed Semper to purchase Cellexo's full interest in Blue Zone (and, thus, in Eternus too), ***but only in exchange***

---

[3] If Rafael Gonzalez was clandestinely working for Restem (or any other entity) at the same time, or if he has shared any of the proprietary information falling under the Consulting Agreement with Restem, both instances would be clear breaches exposing him and Restem to significant liability.

[4] The foreclosed debt evolved from a Secured Promissory Note given to Cellexo by Pla and Semper upon the discovery that Pla had misappropriated company funds. When caught, Pla claimed he did not have sufficient funds to repay the misappropriated amount, so he pledged his ownership in Blue Zone to secure the repayment. Upon default, the referenced foreclosure occurred.

***for the assignment of all of Eternus' Intellectual Property <u>to Cellexo's affiliate, CIM Holdings</u>***, as was unambiguously set forth in Subsection 2(e) of the MIPA as follows:

> (e)   Eternus Intellectual Property Assignment.   At the Closing, ==Eternus shall assign all right, title and interest in and to all intellectual property owned or used by Eternus to The CIM Holdings Group, LLC, a Florida limited liability company== and affiliate of Seller ("<u>CIM</u>"), by executing an assignment of intellectual property, in the form attached hereto as **<u>Exhibit A</u>** (the "<u>Assignment of Intellectual Property</u>"). The Buyer Parties acknowledge and agree that no consideration, other than the consideration set forth in this Agreement, shall be paid to Eternus or any of the Buyer Parties for the assignment of such intellectual property in Eternus pursuant to this Agreement.

**Exhibit C**, MIPA § 2(e) (emphasis added). Critically, ***Brian Pla executed the MIPA*** in his individual capacity, **<u>and</u>** as Managing Member of Semper, and cannot feign ignorance of the MIPA or to its above clearly controlling provision. Indeed, Brian Pla's knowledge (as well as Plaintiff's and its counsel's knowledge) of the validity of the MIPA can be viewed in the following passing reference the Complaint makes to the MIPA:

> Founder).  Miguel is no longer an owner of Eternus—on or about March 17, 2023, Miguel (through Cellexo, LLC) entered into a "Membership Interest Purchase Agreement" under which Miguel sold his Eternus ownership interest to Semper Iuvenis LLC (of which Mr. Pla was the Manager).

(ECF 1, at ¶16) (emphasis added). Notably, however, although the MIPA is referenced in this single sentence within the Complaint, the MIPA is ***not*** attached as an exhibit, and there is absolutely no discussion of the bargained-for consideration (*i.e.* the transfer of ***all of*** Eternus' Intellectual Property to CIM Holdings) exchanged for Semper's ability to purchase the referenced non-intellectual property interest in Eternus.

Moreover, and also ignored by the Complaint, on April 18, 2023, to consummate the intent of the foregoing Intellectual Property Assignment provision within the MIPA, ***<u>Brian Pla himself</u>***

executed an agreement **on behalf of Eternus** titled "Assignment of Intellectual Property" transferring **all** Intellectual Property owned by Eternus (which unambiguously included all intellectual property that may have evolved from the Consulting Agreement with Rafael Gonzalez) to CIM Holdings. *See* **Exhibit D** § 1(ii), (iv) and (v), Assignment of Intellectual Property. To be certain, the definition of what constituted the universe of Intellectual Property under the MIPA's attached Assignment of Intellectual Property was unambiguously and intentionally broad and all-encompassing, providing as follows:

> 1.   Definition of Intellectual Property.  "Intellectual Property" means all of the following owned or licensed by Assignor, in any jurisdiction throughout the world: (i) all trademarks (registered or unregistered), service marks, brand names, trade names, domain names, certification marks, trade dress, assumed names, other indications of origin and the goodwill associated therewith, and all registrations or applications for registration thereof in any jurisdiction, including any extension, modification or renewal of any such registration or application other than (A) the trade name "Eternus Biosciences" or any logos associated therewith, and (B) the eternusbiosciences.com domain name; (ii) all patents, patent applications, continuations, continuations-in-part, divisionals and foreign counterparts in any jurisdiction; (iii) all copyrights, database rights and moral rights in both published works and unpublished works, including all such rights in software, user and training manuals, marketing and promotional materials, internal reports, business plans and any other writings, expressions, mask works, firmware and videos, whether copyrighted, copyrightable or not, and all registrations or applications for registration of copyrights thereof and any renewals or extensions thereof in any jurisdiction other than copyrighted text on the eternusbiosciences.com website related to Assignor; (iv) trade secret and confidential information, and rights in any jurisdiction to limit the use or disclosure thereof by a third party, including such rights in inventions, discoveries and ideas, whether patented, patentable or not in any jurisdiction (and whether or not reduced to practice), know-how, technical information, proprietary information, technologies, processes and formulae, software, data, plans, drawings and blue prints, whether tangible or intangible and whether stored, compiled, or memorialized physically, electronically, photographically or otherwise; and (v) any similar intellectual property or proprietary rights similar to any of the foregoing, licenses, immunities, covenants not to sue and the like relating to the foregoing, and any claims or causes of action arising out of or related to any infringement, misuse or misappropriation of any of the foregoing.

*Id.* (emphasis added). The plain and unambiguous language of the foregoing definitions should be the end of any question concerning Brian Pla's, Rafael Gonzalez's, and of Plaintiff's counsels' knowledge of the transfer to CIM Holdings of all relevant intellectual property of Eternus. The foregoing language unequivocally intended to confirm the consideration called for under the MIPA mandating that "Eternus **shall assign** all right, title and interest in and to **all intellectual property**

**owned or used by Eternus**…" **Exhibit C**, § 2(e).  There can be no legitimate question that Eternus was the only party (and beneficiary) to the Consulting Agreement with Rafael Gonzalez at the time the MIPA and Assignment were executed.

Based on the foregoing unavoidable chain of ownership of **_all_** Intellectual Property owned by Eternus, there can be no doubt that CIM Holdings was the legal assignee of **_all_** Intellectual Property that existed at the time in question, and that the Complaint, unquestionably spearheaded by Brian Pla and Rafael Gonzalez, is thus brought in bad faith and in total disregard of the documents, mutual understandings, facts, <u>and</u> law. Plaintiff's counsel should have surely known of the foregoing facts ***prior to*** filing the Complaint had it been diligent in conducting even a cursory pre-filing investigation, and, *at an absolute bare minimum*, should have realized such realities upon receipt of the instant Motion.

Bottom line, the Complaint should have <u>never</u> been filed, and should have been immediately dismissed voluntarily upon receipt of the instant Motion. Clearly, this lawsuit is tantamount to yet another misuse of the judicial process by Plaintiff and Brian Pla, and should not be tolerated. For the foregoing reasons (and those that follow), this Court must: (a) dismiss the litigation; and (b) impose sanctions against not only Plaintiff and its attorneys, but also against Brian Pla, individually, **and** Rafael Gonzalez, individually, for their transparently malicious and bad faith conduct in causing the instant litigation to be filed.

## <u>LEGAL STANDARD</u>

District courts have the inherent power to impose sanctions against a party who acts in bad faith, vexatiously, wantonly, or for oppressive reasons. *See Marx v. Gen. Revenue Corp*., 568 U.S. 371, 382 (2013) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991)). This "inherent-powers standard is a subjective bad-faith standard." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F. 3d 1218, 1223 (11th Cir. 2017)). And, "[i]f 'particularly egregious', pursuit of a claim without reasonable inquiry into underlying facts can be the basis for a finding of bad faith." *Glob. Life Techs. Corp. v. Medline Indus., Inc.*, No. 20-21240-CIV, 2024 WL 3548764 at *3 (S.D. Fla. July 26, 2024) (quoting *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998)).

In addition to this inherent power, Rule 11 is relatedly structured to "reduce frivolous claims, defenses, or motions, and to deter costly, meritless maneuvers." *Kaplan v. DaimlerChrysler, A.G.*, 331 F. 3d 1251, 1255 (11th Cir. 2003) (quoting *Massengale v. Ray*, 267 F. 3d 1298, 1302 (11th Cir. 2001)). Indeed, Rule 11 imposes an affirmative duty on attorneys to conduct a reasonable inquiry into the factual **and** legal basis of a claim ***prior to filing suit***, *i.e.,* to ensure it is not frivolous. *Lampf v. Trazenfeld*, No. 24-80357, 2024 WL 5164854 at *1 (S.D. Fla. Dec. 5, 2024) (citing *Walther v. Mcintosh*, 572 F. App'x 881, 883 (11th Cir. 2014)) (citations omitted); *see also Worldwide Primates, Inc. v. McGreal*, 87 F. 3d 1252, 1255 (11th Cir. 1996) ("*Worldwide Primates II*") (finding that attorney failed to conduct a minimal inquiry into laws and facts prior to filing the claim). To this end, under Rule 11(b), sanctions become proper when a party either "(1)…files a pleading that  has no factual basis; (2)…files a pleading that is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law; **or** (3)…files a pleading in bad faith for an improper purpose." *Massengale v. Ray*, 267 F. 3d 1301 (emphasis added).  To be clear, "a violation of any one of these

[Rule 11(b)] requirements is sufficient to support a motion for sanctions." *Peer v. Lewis*, 606 F. 3d 1306, 1312 (11th Cir. 2010). Against the foregoing backdrop, when confronted with a motion for Rule 11 sanctions, the district court

> …first determines whether the party's claims are objectively frivolous—in view of the facts or law—and then, if they are, whether the person who signed the pleadings should have been aware that they were frivolous; that is, whether he would have been aware had he made a reasonable inquiry.

*O'Bryan v. Joe Taylor Restoration, Inc.*, No. 20-80993, 2022 WL 202683 at *2 (S.D. Fla. Jan. 24, 2022) (quoting *Jones v. Int'l Riding Helmets, Ltd*., 49 F. 3d 692, 695 (11th Cir. 1995)). "If the attorney failed to make a reasonable inquiry, then the court ***must*** impose sanctions despite the attorney's good faith belief that the claims were sound." *Jones*, 49 F. 3d at 695 (emphasis added).

## LEGAL ARGUMENT

### I.     Plaintiff's claims are objectively frivolous in view of both fact and law.

"Rule 11 imposes a *nondelegable duty* upon the signing attorney to conduct his own independent analysis of ***the facts and law*** which form the basis of a pleading or motion." *In re BankAtlantic Bancorp, Inc. Sec. Litig*., 851 F. Supp. 2d 1299, 1311 (S.D. Fla. 2011), *aff'd sub nom. Hubbard v. BankAtlantic Bancorp, Inc.*, 503 F. App'x 677 (11th Cir. 2012) (quoting *Garr v. U.S. Healthcare, Inc.,* 22 F. 3d 1274, 1277 (3d Cir. 1994)) (emphasis added). In the present case, based on the citation to the MIPA in the Complaint, it unfortunately appears that Plaintiff's counsel, *at best*, failed to conduct even a basic, let alone reasonable, analysis into the facts (*to wit*: by reading the unambiguous language within the MIPA and the subsequent Assignment of Intellectual Property referenced therein) and law on which it relies in bringing forth Plaintiff's claims against Defendants in this litigation. At worst, and given the MIPA and Assignment of Intellectual Property were readily known (indeed, Plaintiff refers to the MIPA in its Complaint,

and the Assignment of Intellectual Property is referenced within the MIPA itself), Plaintiff and its counsel intentionally turned a blind-eye to the agreements' provisions' fatal impact on the claims advanced in this lawsuit. Either analysis results in the same conclusion: this lawsuit is frivolous.

  A.  ***Restem's claims are factually frivolous.***

"[A] factual claim is considered frivolous if 'no reasonably competent attorney could conclude that it has a reasonable evidentiary basis, because it is supported by no evidence or only by patently frivolous' evidence.'" *Thompson v. RelationServe Media, Inc.*, 610 F. 3d 628, 665 (11th Cir. 2010) (citing *Davis v. Carl,* 906 F. 2d 533, 535-567 (11th Cir. 1990)). In *Worldwide Primates, Inc. v. McGreal*, for example, the plaintiff filed a single-count complaint, alleging the defendant tortiously interfered with its business relationship by sending two letters to one of their clients, purportedly casting the plaintiff in bad light. 26 F. 3d 1089, 1090 (11th Cir. 1994) ("*Worldwide Primates I*"). The actual letters in question each included an attached report from the United States Department of Agriculture ("USDA"), each seemingly substantiating the content of the defendant's letters; notably, the same reports were previously sent by the USDA to the plaintiff. Importantly, although the plaintiff's attorney attached the defendant's letters to the complaint, it failed to attach the supplementary USDA Reports. *Id*.

The district court in *Worldwide Primates I* initially declined to impose sanctions, but, on appeal, the Eleventh Circuit reversed and remanded when it found the plaintiff's claim to be factually frivolous because the plaintiff attached to its complaint the allegedly tortious letters as the basis for their claims, ***yet*** (i) omitted from the complaint material facts about those letters (*i.e.,* the attachments that provided the basis for the letters themselves), and (ii) had actual knowledge, through plaintiff's president (*i.e.* the recipient of documents precluding the claim), that it lacked a factual basis by which to bring its claim. *Id*, *generally*. Based on the foregoing, the Eleventh Circuit reversed the district court's declining to impose Rule 11 sanctions, finding the plaintiff's claim to

be objectively frivolous, and declaring there was no factual basis for the plaintiff's claim when the very documents it relied upon contained factual details that precluded its claims. *Id*. at 1092.

Application of the foregoing should result in this Court likewise finding Plaintiff's claims at bar to be factually and objectively frivolous, as one of the very documents cited in Plaintiff's Complaint – the MIPA – utterly obliterates the "ownership" claims made within the Complaint, and no reasonably competent attorney (who conducted a diligent investigation) could have found a factual basis on which to bring forth Plaintiff's claim of ownership of the '036 Patent or its underlying intellectual property. Indeed, just like the plaintiff in *Worldwide Primates I*, Plaintiff *sub judice* not only references the MIPA in the instant Complaint, ***but it also*** (i) intentionally failed to attach the MIPA ***or*** its accompanying Assignment of Intellectual Property to the Complaint, ***and*** (ii) intentionally omits from the Complaint other material facts (*e.g.* in addition to not attaching said documents and the Eternus/Gonzalez Consulting Agreement, Plaintiff also failed to even disclose the MIPA's Section 2(e), or Sections 1 and/or 2 of the Assignment Agreement, each of which establishes a total lack of a factual basis for its claims). Such omissions were no doubt intentionally aimed at bolstering Plaintiff's claims due to an otherwise complete void of evidentiary support. Such conduct should not be condoned. *See also In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 851 F. Supp. 2d 1299, 1313-1314 (S.D. Fla. 2011), *aff'd sub nom. Hubbard v. BankAtlantic Bancorp, Inc.*, 503 F. App'x 677, 679 (11th Cir. 2012) (finding that plaintiff's counsel violated Rule 11(b) by alleging factual contentions about a witness' involvement in the case when such contentions lacked evidentiary support because the witness' contradictory transcripts were readily available to plaintiff's counsel).

Simply put, Plaintiff's claims are objectively and factually frivolous, requiring immediate dismissal and the imposition of sanctions to deter such future abuse of the judicial process.

B.      *Plaintiff's claims are also legally frivolous.*

A legal claim is considered frivolous if "no reasonable attorney could conclude that it has any reasonable chance of success or is a reasonable argument to change existing law*." Cohen v. Burlington*, 2020 WL 1033349 at *7 (quoting *Thompson*, 610 F. 3d at 665). To this end, all of Plaintiff's claims are based on the manufactured claim of purported ownership of the '036 Patent, and its underlying intellectual property. (ECF 1, ¶ 24, 42, 60-61, 69-70, and 74). In advancing such claims, however, Plaintiff and its counsel wholly (and intentionally) ignore the Work Product provision within Rafael Gonzalez's Consulting Agreement, the MIPA, the intellectual property assignment language within the MIPA, **and** the resulting Assignment of Intellectual Property, all of which unequivocally resulted in the assignment of ***all of*** Eternus' intellectual property to Defendant Miguel's company, CIM Holdings. Such facts are intentionally ignored as, *with them*, no reasonable attorney could ever conclude that Plaintiff's claims have any reasonable chance of success under any legal theory, or that any of them present a possibility of altering existing law.

For example, under either the Defend Trade Secrets Act ("DTSA") or the Florida Uniform Trade Secret Act ("FUTSA"), an essential element to prove misappropriation of trade secrets is ownership of the trade secret in question. *See, e.g., Partners Biomedical Sols., LLC v. Saltsman*, No. 19-CV-81316, 2021 WL 4244861 at *21 (S.D. Fla. Sept. 17, 2021) (emphasis added) ("…the DTSA only permits the "***owner***" of the trade secrets to bring a civil action…'"); *see also*, *e.g.*, *Shores Glob., LLC v. Krenzen*, No. 21-20623-CIV, 2024 WL 3636620 at *2 (S.D. Fla. Aug. 2, 2024) (citing *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1297 (11th Cir. 2018) (citations omitted)) (emphasis added) ("To prevail on a FUTSA claim, "'a plaintiff must demonstrate that (1) it possessed a 'trade secret'…"); *see also Pioneer Int'l (USA), Inc. v. Reid*, No. 2:07-CV-84-FTM-34DNF, 2007 WL 9718721, at *7 (M.D. Fla. Oct. 9, 2007) (denying

plaintiff's motion for preliminary injunction because plaintiff ***did not own or possess*** the trade secrets at issue).

In *Saltsman*, for example, the plaintiff brought claims against the defendant for trade secret misappropriation under both, the DTSA and FUTSA. 2021 WL 4244861 at *19-22. It was learned during the litigation, however, that "…[p]laintiffs do not own the alleged trade secrets[]" because the plaintiffs sold, assigned, or otherwise transferred the trade secrets at issue to a counter-defendant. *Id*. at *21. Based on this lack of ownership, the court thus ultimately granted a motion for summary judgement against both misappropriation claims. *Id*. at *21-22. In other words, neither misappropriation claim was legally sustainable due to the plaintiff's inability to prove its ownership. The same holds true here.

At bar, all of Plaintiff's claims are based on unsupportable conclusory claims of ownership, and boldly ignore that the ownership of any and all intellectual property that was even arguably created by Rafael Gonzalez were, at the time, owned by Eternus (*i.e.*, per the Consulting Agreement between Rafael Gonzalez and Eternus), and then fully, completely and irrevocably assigned by Eternus to CIM Holdings in April 2023. *See* **Exhibit C**, MIPA, § 2(e); *see also* **Exhibit D**, Assignment of Intellectual Property, § 1-2; **Exhibit B**, Consulting Agreement, § 8(c). In other words, Plaintiff Restem was ***never*** in the chain of ownership of any intellectual property subject to this litigation; hence, its notable failure to attach any documents to the Complaint to suggest otherwise.

Here, Plaintiff falsely claims (consistently in conclusory fashion, of course) that it owns the GSM Product (and, thus, its related trade secrets, confidential information, etc.) because its Chief Development and Scientific Officer, Rafael Gonzalez, allegedly invented its formulation and then somehow assigned such to Restem. *See, e.g.,* (ECF 1, ¶ 15 and 24) (emphasis added).

Leaving aside the meritless nature of the assertions within Rafael Gonzalez's claims of inventorship, these conclusory averments by Plaintiff seek to obscure reality, as all of said averments (regardless of their merit) are belied by the controlling legal documents cited above, and all of which were well-known to Plaintiff, Rafael Gonzalez and Brian Pla. Indeed, Rafael Gonzalez's consulting agreement expressly and unambiguously affirmed that he was not involved with any conflicted relationship, and irrevocably agreed that any and all intellectual property developed or worked on by him was automatically to be "considered 'work made for hire' **to the fullest extent permitted under applicable federal and Florida law** and shall remain at all times the sole property of [Eternus]." **Exhibit B,** at §8(c) (emphasis added). Thus, even if new "inventions" or concepts were developed or considered by Rafael Gonzalez relating to Eternus' business or products before the Consultant Agreement was executed, the information and intellectual property rights were passed to Eternus with the Consulting Agreement. *Id*. Indeed, the word "remain" indicates that those prior concepts, if any, were already the property of Eternus.

Likewise, Brian Pla is no doubt aware that he executed the MIPA and the associated Assignment of Intellectual Property, both documents containing inescapably clear language providing that CIM Holdings was to receive the benefit of an Assignment "in and to **all intellectual property owned or used by Eternus**…" **Exhibit C**, MIPA § 2(e) (emphasis added); *see also* **Exhibit D**, Assignment of Intellectual Property (where the "Intellectual Property" assigned **by Eternus** under the actual Assignment given to CIM Holdings included, *in pertinent part*, "all patents, patent applications, continuations, continuations-in-part, divisionals and foreign counterparts in any jurisdiction" and all "trade secret and confidential information, and rights in any jurisdiction to limit the use or disclosure thereof…" and "any similar intellectual property or proprietary rights…"). Thus, assuming *arguendo* that Rafael Gonzalez meaningfully

contributed to the development or advancement of any intellectual property, any such contribution was irrevocably considered Work Product, ownership of which was automatically vested in Eternus, which was subsequently assigned to CIM Holdings. Simply put, Plaintiff lacks any credible claim to ownership of **any** of the intellectual property at issue in this litigation.

Just as the *Saltsman* Court dismissed that litigation when it found the plaintiff lacked ownership in the trade secrets at issue there, dismissal should similarly occur here as no reasonable attorney could have concluded that Plaintiff Restem *sub judice* ever had any reasonable chance to successfully prove trade secret misappropriation when it does not own the very trade secrets in question. In fact, as described above, the intellectual property at issue in this case is actually owned by the Defendants being sued, thereby making this case doubly absurd and frivolous as it is essentially being pursued *against the owners of the intellectual property at issue*.[5] *See Saltsman*, 2021 WL 4244861, at *19-21 (granting defendant's motion for summary judgment against plaintiff's claims for trade secret misappropriation under both DTSA and FUTSA because plaintiffs no longer owned the trade secrets after assigning them away).

As a final aside, Plaintiff Restem also asserts a claim under 35 U.S.C. §256 in an effort to "correct" the inventorship under the '036 Patent. This claim, however, is also meritless, in part because Restem, *without question*, lacks constitutional standing to pursue such a claim. In other words, even setting aside the issue of whether Rafael Gonzalez can somehow be considered a co-inventor of any of the inventions claimed in the '036 Patent, a cursory review of the controlling jurisprudence reveals that a claim under §256 necessarily fails. Indeed, where a proponent of a

---

[5] CIM Holdings was the assignee of all of Eternus' Intellectual Property under the April 2023 Assignment, and CIM Holdings is the majority owner of Defendant Neuvian, and has assigned all of its right and title to all of its intellectual property to Neuvian. Moreover, Defendant Miguel is the owner of CIM Holdings, and Miguel and co-defendant Bouhadir are the *only* other shareholders in Neuvian; hence, the conclusion that this litigation is, *in essence*, absurdly being pursued against the owners of the very intellectual property underlying all claims.

claim under §256 lacks the ability to claim ownership of the patent (or derive some other direct financial benefit from the patent should inventorship thereunder be altered), then a §256 claim cannot withstand attack. *See Larson v. Correct Craft, Inc.*, 569 F. 3d 1319, 1326 (Fed. Cir. 2009).

In *Larson*, for example, the plaintiff was an inventor of an invention that resulted in the issuance of a patent. *Id*. at 1322. The plaintiff was not meaningfully involved with the patent application process, other than at its early stages when he assigned his rights in the invention to his employer, and his employer thereafter applied for patent protection. *Id*. Post issuance, the plaintiff became aware that two other individuals (his co-workers) were also named as co-inventors, and the plaintiff became dismayed at this discovery. *Id*. The plaintiff eventually filed suit against his employer claiming he was fraudulently induced into assigning his rights, and sought recission of his assignment. *Id*. at 1319. The plaintiff also sought to correct inventorship under §256 to remove the improperly named co-inventors. *Id*. at 1322. The suit was originally filed in state court, but removed to federal court based on the §256 claim. *Id*. at 1322. The district court thereafter granted summary judgment against the plaintiff, and an appeal to the Federal Circuit ensued. *Id*. at 1323.

On appeal, the Federal Circuit declared that removal was improper, finding the plaintiff lacked standing under §256 to correct inventorship of the patent. *Id*. at 1327. The Court reasoned that the plaintiff lacked standing because he assigned his rights in the invention to his employer, and, thus, could not seek inventorship correction because he "lacks an ownership interest [in the patent], and because being declared the sole inventor will not generate any other direct financial rewards…" *Id*. at 1326. Importantly, the *Larson* Court was careful to note that the analysis is the same where an individual claims to have been improperly omitted from being identified as an inventor of a patent. *Id*. at 1326-27 (*citing Chou v. Univ. of Chi.*, 254 F.3d 1347 (Fed. Cir. 2001)

(where standing existed under §256 to add an inventor to a patent because the plaintiff would become entitled to receive royalties under her employment contract if named as a co-inventor). Suffice it to say, therefore, the *Larson* Court absolutely precludes Restem from pursuing a claim to add Rafael Gozalez as an inventor to the '036 Patent, and pursuit of such a claim is frivolous.

As discussed throughout this Motion, even a basic investigation would have revealed that Rafael Gonzalez, by virtue of the unambiguous Work Product provision within his Consulting Agreement, was irrevocably divested of any right to claim or seek ownership (or any other pecuniary interest) in any discovery he may otherwise claim. Instead, the Consulting Agreement irrefutably vested such ownership in Eternus. **Exhibit B**, §8(c). Likewise, a simple review of the MIPA and its associated Assignment of Intellectual Property would have readily revealed to Restem and its counsel that Eternus assigned **all** of its intellectual property to CIM Holdings, including all rights flowing from the referenced Consulting Agreement. *See* **Exhibit C**, MIPA, § 2(e); *see also* **Exhibit D**, Assignment of Intellectual Property, § 1-2; **Exhibit B**, Consulting Agreement, § 8(c). In other words, neither Eternus nor Rafael Gonzalez stand to claim any financial interest in any aspect of the '036 Patent. In light of these realities, there exists no plausible basis on which a reasonably competent attorney could find in good faith that Plaintiff Restem can even arguably have standing to sue for correction of inventorship of a patent, as such patent is already owned by another entity. *See also Jim Arnold Corp. v. Hydrotech Systems, Inc.,* 109 F. 3d 1567, 1571–72 (Fed. Cir. 1997) (holding that the plaintiff did not have standing to sue for correction of inventorship because it did not have an ownership in the patents). Once again, Restem's claims are entirely frivolous.

Accordingly, for all of the foregoing reasons, this Court should find Plaintiff's claims to be legally and utterly frivolous in all respects because all claims are based on Plaintiff's alleged

ownership of intellectual property that is simply not owned by it – and, worse, the intellectual property at issue was actually assigned via documents executed by Rafael Gonzalez and Brian Pla, themselves. The foregoing realities would lead a reasonably competent attorney to conclude that Plaintiff's claims are legally frivolous as it would have no chance to prove the elements of its claims. *See Gonzalez v. Petromar Int'l, Inc.*, No. 22-60574-CIV, 2023 WL 8679849 at *3 (S.D. Fla. June 28, 2023) (finding sanctions appropriate for objectively frivolous claim because no legal basis existed when one of claim's elements could not have been met); *see also Cargile v. Viacom Int'l, Inc.*, 282 F. Supp. 2d 1316, 1320 (N.D. Fla. 2003) (citations omitted) (imposing sanctions against attorney because it maintained trade secret misappropriation claims despite having an "overwhelming lack of evidence," stating that the attorney showed a "deliberate indifference to obvious facts"); *Homecare CRM, LLC v. Adam Grp., Inc. of Middle Tennessee*, 952 F. Supp. 2d 1373, 1380 (N.D. Ga. 2013) (awarding sanctions against attorney for filing factually and legally frivolous claims for trade secret misappropriation because the evidence showing the frivolousness of the claim was in the attorney's possession); *Superior Consulting Servs., Inc. v. Steeves-Kiss*, 786 F. App'x 648, 651 (9th Cir. 2019) (affirming sanctions against attorney for filing legally and frivolous claims for misappropriation of confidential information when it had possession of the very document that precludes those claims and further found the attorney's conduct to be "particularly egregious" because the attorney was notified by its opposing counsel of its complaint's frivolity, yet continued thereafter to pursue its claims in a "misleading manner" by failing to attach or fully explain the precluding document).

Dismissal and sanctions are thus necessary in this instance.

## II.     The Unfortunate Reality leads to the Inescapable Conclusion that Plaintiff's counsel failed to conduct a reasonable pre-filing inquiry of the Claims in-Suit.

Given the inescapable truth that Defendant Jacob Miguel (through CIM Holdings) was the legal owner of the GSM Product (and of all of Eternus' intellectual property at the time of the April 2023 Assignment), the only realistic (*albeit unfortunate*) conclusions are either: (i) Plaintiff's counsel failed to conduct a reasonably diligent pre-filing inquiry to discover the basis (or, in this instance, *the lack thereof*) of the claims in suit, or, *worse,* (ii) Plaintiff's counsel recklessly disregarded the facts in advancing the lawsuit. Either way, the result is the same: this litigation must be dismissed due to its meritless nature, and sanctions under both Rule 11 and this Court's inherent power should be levied against counsel, its client, and its client executives, Pla and Gonzalez.

Indeed, to determine whether an attorney has made a reasonable inquiry into the client's claim, a court may consider factors such as (1) how much time for investigation was available to counsel and (2) whether counsel had to rely on a client for the facts used.[6] *Worldwide Primates II*, 87 F. 3d at 1254 (citing *Mike Ousley Productions, Inc. v. WJBF–TV*, 952 F. 2d 380, 382 (11th Cir. 1992)). Analysis of each of the foregoing buttresses the need for immediate dismissal and imposition of sanctions.

Firstly, there can be no question ample time was available to counsel to conduct a thorough investigation into the underlying facts *before* filing the litigation. There is no indication that this lawsuit was filed under any urgency time pressures or constraints, nor has Plaintiff sought any injunctive relief from this Court. In fact, although the Complaint was filed on January 15, 2025, (ECF 1), counsel did not file proposed Summonses until January 22, 2025, (ECF 13), and did not

---

[6] Courts may also consider whether a forwarding counsel was involved in the frivolous filing, but such is not apparent on the record at this stage, and is, therefore, not addressed herein at this juncture.

complete service of the Complaint on all defendants until February 10, 2025, (ECF 18), nearly one-month after the filing of the Complaint. In other words, the timing of the filing of the instant litigation was fully controlled by Plaintiff and its counsel, and each could have taken a slower, more measured, approach if counsel needed additional time to complete a reasonably diligent investigation of the facts and claims to be lodged. Analysis of this first factor thus weighs decisively towards finding that counsel shirked its duty to conduct a proper pre-filing inquiry.

The second factor courts evaluate to determine whether counsel made a reasonable prefiling inquiry focuses on whether counsel was required to rely on its client for the facts underlying the claims in-suit. Although counsel regularly rely on their clients to be truthful in relaying information, when reasonably available methods exist to confirm a client's recount, counsel **must** do so. *Worldwide Primates, Inc. v. McGreal*, 87 F. 3d 1252, 1255 (11th Cir. 1996) ("**an attorney cannot simply rely on the conclusory representations of a client**….") (emphasis added). Here, the **<u>entire</u>** premise of the claims in-suit crumble upon a simple review of the MIPA, of which counsel was certainly aware. Yet, instead of recognizing the MIPA's impact on the claims in-suit, counsel chose only to reference the MIPA in Paragraph 16 of the Complaint for the myopically narrow purpose of alleging "Miguel sold his Eternus ownership interest to Semper…" (ECF 1, at ¶16).

Notably, however, for counsel to make such a claim it would have needed to (or at least reasonably *should have*) review the MIPA to confirm such transfer of ownership occurred; and, *had it done so*, it would have quickly been unambiguously revealed that part of the consideration for any transfer to Semper was CIM Holdings' receipt of an assignment "in and to **<u>all intellectual property owned or used by Eternus</u>**…" *See* **Exhibit C,** § 2(e), MIPA, (emphasis added). The resulting Assignment – ***also containing Brain Pla's signature*** – is just as explicit and definite and

reflects that Eternus irrevocably transferred *all* of its interest in *all* of its intellectual property that existed as of April 2023. Indeed, said Assignment of Intellectual Property broadly defines Eternus' transfer/assignment of its "Intellectual Property" to include, *in pertinent part,* the following:

(i)     "*all patents, patent applications*, continuations, continuations-in-part, divisionals and foreign counterparts *in any jurisdiction*…"

(ii)    "*trade secret and confidential information*, and rights in any jurisdiction to limit the use or disclosure thereof by a third party, *including such rights in inventions, discoveries and ideas, whether patented, patentable or not in any jurisdiction* (and whether or not reduced to practice), *know-how, technical information, proprietary information, technologies, processes and formulae*, software, data, plans, drawings and blue prints, *whether tangible or intangible* and whether stored, compiled, or memorialized physically, electronically, photographically or otherwise; *and*"

(iii)   "*any similar intellectual property or proprietary rights* similar to any of the foregoing…"

*See* **Exhibit D**, §1 (emphasis added). It thus necessarily follows that unless Rafael Gonzalez was clandestinely moonlighting under a separate (and inappropriate) consulting agreement with Restem – *which would expose Rafael Gonzalez and Restem to considerable liability* – part of the intellectual property assigned *via* the above assignment language would have necessarily included any and all work (regardless of the level or significance thereof) performed by Rafael Gonzalez under his consulting agreement with Eternus. *See* **Exhibit B**, §8(c), Work Product Provision within the Consulting Agreement. And, inasmuch as Rafael Gonzalez is a touted executive of Restem, there is no doubt that Plaintiff's counsel had access to him in its preparation of this instant lawsuit. And, further, there is likewise no question that Plaintiff's counsel had access to all documents necessary, in addition to personal knowledge from its own client executives, to conclude that Plaintiff's claims have no viable basis, at either fact or law, upon which to seek recovery.

In other words, there were (and are) many documents available to counsel where it did not need to rely on its client to form the basis of the allegations in-suit. *Worldwide Primates II*, 87 F. 3d at 1255 ("…an attorney cannot simply rely on the conclusory representations of a client…."). Had it consulted the relevant documents, counsel would have readily learned the complete absence of any cognizable basis for any of the claims in suit. Analysis of this second factor, therefore, also weighs conclusively towards finding that counsel failed to conduct a reasonable pre-filing inquiry before instituting this frivolous litigation. *See, e.g., Gulisano v. Burlington, Inc.*, 34 F. 4th 935, 944 (11th Cir. 2022) (finding sanctions appropriate where counsel should have known his arguments were objectively frivolous because a simple search of Florida's registered corporations would have alerted counsel to the baseless nature of the claim advanced); *see also, e.g., Williams v. R.W. Cannon, Inc.*, No. 08-60168-CIV-UNGARO, 2008 WL 4372894, at *3 (S.D. Fla. Sept. 24, 2008) (imposing sanctions against defense counsel where counsel had "no circumstances to justify Defendant's failure to conduct the cursory investigation necessary…").

Based on all the foregoing, there can be no question that counsel, here too, failed to conduct even a basic pre-filing investigation *before* filing the instant frivolous litigation. Such failure was, *at best*, reckless as there is simply no basis in document, fact, or law for the claims in-suit; at worst, they were intentionally blind to the facts in an effort to camouflage the lack of support for the claims lodged. The instant litigation was brought in bad faith, should be dismissed, and sanctions imposed against counsel, its client, and its client executives, Pla and Gonzalez.

### III.    Plaintiff Restem, Brian Pla, and Rafael Gonzalez should also be Sanctioned.

In the event a client has made a "knowing factual misrepresentation" or is the "mastermind" behind a frivolous case, sanctions directly against the client are appropriate. *Johnson v. 27th Avenue Caraf, Inc.*, 9 F. 4th 1300, 1315 (11th Cir. 2021) (citing *Byrne v. Nezhat*, 261 F. 3d 1075,

1118 (11th Cir. 2001) (quotation marks omitted) <u>abrogated on other grounds as recognized by</u> *Jackson v. Bank of Am., N.A.*, 898 F. 3d 1348, 1357 n.10 (11th Cir. 2018)). To be clear, "[a] court may sanction a corporate officer for his bad-faith conduct during litigation by imposing attorney's fees, even when the corporate officer is a non-party." *Mastercard Int'l, Inc. v. Ishak*, 2004 WL 1059795 at *4 (S.D. Fla. Mar. 11, 2004) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 32-33 (1991)).

Here, Brian Pla and Rafael Gonzalez (both executives at Restem) are, without question, the masterminds behind Plaintiff's frivolous claims. Brian Pla's and Rafael Gonzalez's factual misrepresentations and omissions – at least the most obvious ones – are illustrated by the following:

- Rafael Gonzalez executed a Consulting Agreement on January 15, 2022 with Eternus, whereby he represented and affirmed that he was not contracted or involved with any other person or entity that would pose a conflict, and wherein he irrevocably agreed that any and all work of his (regardless of its level of significance) was considered Work Product, ownership of which was fully vested in Eternus, *See* **Exhibit B,** §§7, 8(c);

- Brian Pla (on behalf of Eternus) signed the MIPA in which Eternus agreed to assign to CIM Holdings ***all*** of Eternus' intellectual property, including any intellectual property that emanated from Rafael Gonzalez's Consulting Agreement with Eternus, *See* **Exhibit C,** § 2(e);

- Brian Pla (on behalf of Eternus) signed the Assignment of Intellectual Property, consummating the earlier intent to assign to CIM Holdings all of Eternus' intellectual property, including any intellectual property that originated with Rafael Gonzalez's Consulting Agreement with Eternus, *See* **Exhibit D**, §§1-2;

- Brian Pla misrepresented the MIPA as only concerning Jacob Miguel's sale of the remaining membership interest in Eternus back to Brian Pla's other company, Semper; *See* ECF 1, ¶ 13.

- Brian Pla intentionally omitted (or caused to be omitted) from the Complaint the assignment clause (*i.e.* Section 2(e), "Eternus Intellectual Property Assignment") in the MIPA and the Intellectual Property Assignment themselves; *See* **Exhibits B and D**; and

- Brian Pla and Rafael Gonzalez no doubt had personal knowledge of the contracts obviating Plaintiff's claims *sub judice*, but still encouraged and approved the Complaint's filing; *See* **Composite Exhibit A**.

The foregoing realities convincingly demonstrate that Brian Pla and Rafael Gonzalez not only disregarded the objective facts of this case, but also knew Plaintiff's claims were frivolous, yet (*as the Executives of Restem*) still caused (or allowed) the Complaint to be filed. Further, Brian Pla's status as either an owner or controlling executive of virtually all of the relevant entities should cement the reality of his knowledge and active involvement in pursuing frivolous claims against Defendants, and, as such, he should not be able to escape sanctions. *Mastercard*, 2004 WL 1059795 at *4 (finding corporate representative could not escape sanctions because he was an officer/director at each of the six corporate defendants).

**WHEREFORE**, for all the foregoing reasons, Defendants, Neuvian, LLC, Spencer Bouhadir, and Jacob Miguel, by and through the undersigned counsel, hereby request that this Court enter an Order dismissing the instant frivolous litigation with prejudice, and sanctioning Plaintiff, Restem, LLC, Plaintiff's Chief Commercial Officer Brian Pla, Plaintiff's Chief Development and Scientific Officer Rafael Gonzalez, PhD., Plaintiff's attorneys (*to wit*: Kenneth G. Parker, Esq., David B. Clark, Esq., Daniel Lammie, Esq., Kevin C. Kaplan, Esq., and Amanda M. Comas, Esq.), and its attorneys' law firms (*to wit*: HAYNES AND BOONE, LLP, 600 Anton Blvd., Suite 700, Costa Mesa, California 92626, and COFFEY BURLINGTON, P.L., 2601 South Bayshore Drive, Miami, Florida 33133), under Federal Rule of Civil Procedure 11 and this Court's inherent power and authority, jointly and severally requiring the remuneration of all fees and costs incurred in having to defend against the claims in this litigation (including those incurred in the preparation, filing and pursuit of the instant Motion), and for such further and additional relief this Court deems just and proper under the circumstances.

Dated this ___ day of March, 2025.

Respectfully submitted,

By: /s/ Alexander D. Brown_____
Alexander D. Brown, Esq.
Florida Bar No. 752665
**CONCEPT LAW GROUP, P.A.**
6400 N Andrews Ave Ste 500
Fort Lauderdale, Florida 33309
(e): abrown@conceptlaw.com
(t): 754.300.1500
(f): 754.300.1501

## PRE-FILING SERVICE CERTIFICATION

I HEREBY CERTIFY that on March 7, 2025 I served the foregoing upon all counsel of record, but did not file it with the Court pursuant to the 21-day safe harbor provision proscribed in Federal Rule of Civil Procedure 11(c)(2).

Respectfully submitted,

By: /s/ Alexander D. Brown_____
Alexander D. Brown, Esq.
Florida Bar No. 752665
**CONCEPT LAW GROUP, P.A.**
6400 N Andrews Ave Ste 500
Fort Lauderdale, Florida 33309
(e): abrown@conceptlaw.com
(t): 754.300.1500
(f): 754.300.1501

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 7, 2025 I served the foregoing upon all counsel of record, and, following the expiration of the 21-day safe harbor provision proscribed in Federal Rule of Civil Procedure 11(c)(2), I electronically filed the foregoing with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served again on its filing date on all counsel of record on the following Service List via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: /s/ Alexander D. Brown
     Alexander D. Brown, Esq.
     Florida Bar No. 752665
     **CONCEPT LAW GROUP, P.A.**

### SERVICE LIST

Kenneth G. Parker, Esq.
David B. Clark, Esq.
Daniel Lammie, Esq.
**HAYNES AND BOONE, LLP**
600 Anton Blvd., Suite 700
Costa Mesa, California 92626
ken.parker@haynesboone.com
david.clark@haynesboone.com
daniel.lammie@haynesboone.com

and

Kevin C. Kaplan, Esq.
Amanda M. Comas, Esq.
**COFFEY BURLINGTON, P.L.**
2601 South Bayshore Drive
Miami, Florida 33133
kkaplan@coffeyburlington.com
acomas@coffeyburlington.com
groque@coffeyburlington.com

*Attorneys for Plaintiff*

# COMPOSITE EXHIBIT A

*Screenshots Illustrating Brian Pla's Involvement With Relevant Companies*



# OUR PASSIONATE LEADERSHIP TEAM



**Andres Isaias**
Chief Executive Officer

 READ BIO



**Rafael Gonzalez, PhD**
Chief Development & Science Officer

 READ BIO



**Brian Pla**
Chief Commercial Officer

 READ BIO

Previous On List    Next On List    Return to List

eternus bioscience

Search

**No Events    No Name History**

# Detail by Entity Name

Florida Limited Liability Company
ETERNUS BIOSCIENCES, LLC

## Filing Information

| | |
|---|---|
| **Document Number** | L19000206012 |
| **FEI/EIN Number** | 84-2759862 |
| **Date Filed** | 08/13/2019 |
| **State** | FL |
| **Status** | ACTIVE |

## Principal Address

550 BILTMORE WAY, #105
CORAL GABLES, FL 33134

Changed: 02/01/2021

## Mailing Address

550 BILTMORE WAY, #105
CORAL GABLES, FL 33134

Changed: 02/01/2021

## Registered Agent Name & Address

Semper Iuvenis, LLC
6619 South Dixie Hwy
#210
Miami, FL 33143

Name Changed: 04/19/2023

Address Changed: 04/19/2023

## Authorized Person(s) Detail

### Name & Address

Title MGR, Manager

Pla, Brian
550 BILTMORE WAY, #105
CORAL GABLES, FL 33134

Search

**No Events    No Name History**

## Detail by Entity Name

Florida Limited Liability Company
SEMPER IUVENIS LLC

### Filing Information

| | |
|---|---|
| **Document Number** | L13000089695 |
| **FEI/EIN Number** | 46-3028832 |
| **Date Filed** | 06/21/2013 |
| **State** | FL |
| **Status** | ACTIVE |

### Principal Address

550 Biltmore Way
SUITE 105
Coral Gables, FL 33134

Changed: 08/22/2020

### Mailing Address

6619 SOUTH DIXIE HIGHWAY
#210
MIAMI, FL 33143

### Registered Agent Name & Address

Pla, Brian
7975 Sunset Drive
MIAMI, FL 33143

Name Changed: 08/22/2020

Address Changed: 04/17/2023

### Authorized Person(s) Detail

**Name & Address**

Title MGRM

Pla, Brian
550 Biltmore Way
SUITE 105
Coral Gables, FL 33134

**No Events**    **No Name History**

## Detail by Entity Name

Florida Limited Liability Company
BLUE ZONE HOLDINGS, LLC

### Filing Information

| | |
|---|---|
| **Document Number** | L21000338430 |
| **FEI/EIN Number** | N/A |
| **Date Filed** | 07/26/2021 |
| **Effective Date** | 07/26/2021 |
| **State** | FL |
| **Status** | ACTIVE |

### Principal Address

550 BILTMORE WAY, #105
CORAL GABLES, FL 33134

### Mailing Address

550 BILTMORE WAY, #105
CORAL GABLES, FL 33134

### Registered Agent Name & Address

Semper Iuvenis, LLC
6619 South Dixie Hwy
#210
Miami, FL 33143

Name Changed: 04/19/2023

Address Changed: 04/19/2023

### Authorized Person(s) Detail

#### Name & Address

Title MGR

Semper Iuvenis, LLC
6619 South Dixie Hwy
Miami, FL 33143

# EXHIBIT B

*Lcpwct{ "37."4244"Eqpuwnvkpi "Ci tggo gpv"*
*Bgy ggp"Tclcgn"I qp|crg|"cpf "Gvgtpwu*

## CONSULTING AGREEMENT

**THIS CONSULTING AGREEMENT** ("Agreement") is made effective as of January 15, 2022 ("Effective Date") by and between ETERNUS BIOSCIENCES, LLC, a Florida limited liability company (the "Company"), and RAFAEL GONZALEZ, PhD, an individual ("Consultant").

**WHEREAS**, the Company desires to engage Consultant to provide the Consulting Services as set forth in this Agreement; and

**WHEREAS**, Consultant desires to provide the Consulting Services to the Company as set forth herein.

**NOW, THEREFORE,** in consideration of the foregoing and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the Company and Consultant hereby agree as follows:

1. **Engagement; Consulting Services**. The Company hereby agrees to retain Consultant to act as a consultant to the Company and Consultant agrees to accept such engagement and to provide to the Company the following consulting services: (i) the establishment of a cosmetic lab, (ii) the formulation of cosmetic products, (iii) the promotion of cosmetic products, and (iv) such other consulting services as mutually agreed to by the parties (collectively, the "Consulting Services").

2. **Term**. The engagement of Contractor by the Company pursuant to this Agreement shall be for a three (3) month period commencing on the Effective Date and shall automatically renew for successive 30-day periods (hereinafter referred to as the "Consulting Period"), unless otherwise terminated pursuant to the terms hereof. Notwithstanding the foregoing, this Agreement shall terminate upon the expiration of the initial term, or any renewal term, as applicable, upon delivery of written notice by either party prior to the end of the initial term, or a renewal term, as the case may be.

3. **Consulting Fee; Reimbursement of Expenses**.

    (a) **Consulting Fee**. The Company shall pay to Consultant a consulting fee equal to Ten Thousand Dollars (US $10,000.00) per month during the Consulting Period ("Consulting Fee"). The Consulting Fee will be paid to Consultant on or before the 15th day of the month during which the Consulting Fee is earned.

    (b) **Reimbursement of Expenses**. The Company shall reimburse Consultant for all reasonable pre-approved business expenses paid or incurred by the Company in connection with performing the Consulting Services hereunder, including, without limitation, reasonable travel expenses, if applicable. Consultant shall submit expenses for reimbursement in writing with supporting receipts and documentation in accordance with the Internal Revenue Code and Regulations or otherwise required under Company's expense reimbursement procedures as in effect from time to time.

4. **Termination**. This Agreement shall terminate as a result of any of the following events:

    (a) termination pursuant to Section 2 hereof;

    (b) upon the mutual agreement of the parties; or

    (c) upon thirty (30) days' prior written notice from either party of the other party's election to terminate the Agreement.

A termination pursuant to subsection (a) and (c) above shall be communicated by a written notice ("Notice of Termination").  This Agreement shall be deemed to have been terminated as follows: (i) if Contractor's engagement is terminated pursuant to subsection (a) above, the date on which this Agreement terminates, (ii) if Contractor's engagement is terminated pursuant to subsection (b) above, the date on which the parties agree, and (iii) if Contractor's engagement is terminated pursuant to subsection (c) above, on the date set forth in the Notice of Termination.  The date on which termination is deemed to have occurred pursuant to this Section is hereinafter referred to as the "Date of Termination."

5.      **Payments on Termination**.  If this Agreement is terminated pursuant to Section 4 above, the Company shall pay to the Consultant the Consulting Fee and reimburse Consultant the business expenses incurred through the Date of Termination due and owing as of that date.

6.      **Independent Contractor Status; Payments of Taxes**.  It is expressly acknowledged and agreed that the relationship between the Company and Consultant shall be that of an independent contractor. Nothing in this Agreement shall be deemed to create a partnership, joint venture or any employer/employee relationship between the parties hereto.  Consultant shall be solely responsible for and pay when due all estimated tax, withholding, social security, disability, unemployment, self employment and other taxes imposed on Consultant by the United States government or any state or local tax jurisdiction. Consultant agrees that it will comply with all other applicable laws, rules and regulations in the performance of Consultant's obligations under this Agreement, including the procurement of permits or certificates where required. In addition, Consultant will not be eligible for any employee benefits, nor will the Company make deductions from any amounts payable to Consultant for taxes or insurance.

7.      **Representations and Warranties of Consultant**.  Consultant represents and warrants to the Company that he is under no contractual or other restriction or obligation, which would prevent the performance of his duties hereunder or interfere with the rights of the Company hereunder.

8.      **Proprietary Information**.

(a)      Records.  All records of the accounts of the Company, of any nature, whether existing at the time of Consultant's engagement, procured through the efforts of Consultant, or obtained by Consultant from any other source, and whether prepared by Consultant or otherwise, shall be the exclusive property of the Company regardless of who actually purchased or created the original book, record, or magnetic storage unit on which such information is recorded.  All such books and records shall be immediately returned to the Company by Consultant on any termination of this Agreement, whether or not any dispute exists between the Company and Consultant at, regarding, and/or following the termination of this Agreement.

(b)      Confidential Information.

(i)      For purposes of this Agreement, "Confidential Information" means knowledge, information and material which is proprietary to the Company, of which Consultant may obtain knowledge or access through or as a result of his engagement by the Company. Confidential Information includes, but is not limited to, (A) technical knowledge, information and material such as trade secrets, processes, formulas, data, know-how, improvements, inventions, computer programs, drawings, patents, and experimental and development work techniques, and (B) marketing and other information, such as supplier lists, customer lists, marketing and business plans, business or technical needs of customers, consultants, licensees or suppliers and their methods of doing business, arrangements with customers, consultants, licensees or suppliers, manuals and personnel records or data. Confidential Information also includes any information described above which the Company obtain from another party and which the Company treat as proprietary or designates as confidential, whether or not owned or developed by the Company. Notwithstanding the foregoing, any information which is or becomes available to the general public

2

otherwise than by breach of this Section 8 shall not constitute Confidential Information for purposes of this Agreement.

(ii)     During the term of this Agreement and thereafter, Consultant agrees, to hold in confidence all Confidential Information and not to use such information for Consultant's own benefit or to reveal, report, publish, disclose or transfer, directly or indirectly, any Confidential Information to any person or entity, or to utilize any Confidential Information for any purpose, except in the course of Consultant's work for the Company.

(iii)    Consultant will abide by any and all security rules and regulations, whether formal or informal, that may from time to time be imposed by the Company for the protection of Confidential Information, and will inform the Company of any defects in, or improvements that could be made to, such rules and regulations.

(iv)     Consultant will notify the Company in writing immediately upon receipt of any subpoena, notice to produce, or other compulsory order or process of any court of law or government agency if such document requires or may require disclosure or other transfer of Confidential Information.

(c)     Work Product.  All ideas, inventions, products or otherwise, relating in any way to the Company's business or processes, designed, improved, planned, proposed, altered, modified, refined or enhanced by Consultant ("Work Product") shall be considered "work made for hire" to the fullest extent permitted under applicable federal and Florida law and shall remain at all times the sole property of the Company.  Consultant shall not be allowed to use in any manner whatsoever, for his or its own or any other person's or entity's benefit, such Work Product unless he or it receives the prior written consent of the Company. Any and all patents, patent filings, trademarks, copyrights or the like relating in any way to the Company's products and the Work Product shall remain the sole property of the Company and, upon request, Consultant shall execute any and all documents, filings or contracts assigning the same to the Company. Furthermore, whenever requested to do so by the Company, Consultant will execute any and all applications, assignments or other instruments that Company deems necessary to protect the Company's interests therein. Consultant's obligations hereunder shall survive the termination of Consultant's engagement with respect to Work Product conceived or made by Consultant during the term of Consultant's engagement described in this Agreement.

9.     **Availability of Injunctive Relief**.  Consultant acknowledges and agrees that the covenants contained in Section 8 hereof are of the essence in this Agreement, that each of such covenants is reasonable and necessary to protect and preserve the interests, properties, and business of the Company, and that irreparable loss and damage will be suffered by the Company should Consultant breach any of such covenants for which the Company cannot be adequately compensated in damages. Consultant therefore expressly agrees that the Company shall be entitled to seek injunctive and/or other equitable relief, on a temporary or permanent basis to prevent any anticipatory or continuing breach of this Agreement or any part hereof, and is secured as an enforcement. Nothing herein shall be construed as a waiver by the Company of any right it may have or hereafter acquired to monetary damages by reason of any injury to its property, business or reputation or otherwise arising out of any wrongful act or omission of it.

10.    **Survival**.  The covenants, agreements, representations and warranties contained in or made pursuant to this Agreement shall survive the termination of this Agreement, irrespective of any investigation made by or on behalf of any party.

11.    **Modification; Binding Effect**.  This Agreement sets forth the entire understanding of the parties with respect to the subject matter hereof, supersedes all existing agreements between them concerning such subject matter, and may be modified only by a written instrument duly executed by each party.  The Company's rights and obligations under this Agreement shall not be transferable by assignment

3

or otherwise, and any attempt to do any of the foregoing shall be void. The provisions of this Agreement shall be binding upon the Consultant and her heirs and personal representatives, and shall be binding upon and inure to the benefit of the Company, its successors and assigns.

      12.   **Notices**.  All notices, requests, demands, claims, and other communications hereunder shall be in writing. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient, (ii) one business day after being sent to the recipient by reputable overnight courier service (charges prepaid), (iii) one business day after being sent to the recipient by facsimile transmission or electronic mail, or (iv) four business days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

    (a)  If to Consultant:        Rafael Gonzalez, PhD
                                      22667 Old Canal Rd.
                                      Yorba Linda, CA  92887
                                      Fax:
                                      Email:

    (b)  If to the Company:    Eternus Biosciences, LLC
                                        550 Biltmore Way, #105
                                      Coral Gables, FL  33134
                                      Attn: Jacob J. Miguel, Manager
                                      Fax:
                                      Email: jacob@genteramed.com

      Any party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other parties notice in the manner herein set forth.

      13.   **Waiver; Invalidity**.  Any waiver by either party of a breach of any provision of this Agreement shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Agreement. The failure of a party to insist upon strict adherence to any term of this Agreement on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement. All waivers must be in writing. The invalidity or unenforceability of any term of this Agreement shall not invalidate, make unenforceable or otherwise affect any other term of this Agreement, which shall remain in full force and effect.

      14.   **Headings; Counterparts**. The headings in this Agreement are solely for convenience of reference and shall be given no effect in the construction or interpretation of this Agreement. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

      15.   **Agency**.  Nothing herein shall imply or shall be deemed to imply an agency relationship between Consultant and the Company.

      16.   **Governing Law; Venue; Attorneys' Fees**.  This Agreement shall be governed and construed in accordance with the laws of the State of Florida, without giving effect to rules governing conflicts of law. The parties severally, irrevocably and unconditionally (a) agree that any suit, action or other legal proceeding arising out of or relating to this Agreement shall be brought in either a court of record of the State of Florida in Miami-Dade County, or the United States District Court for the Southern District of Florida, (b) consent to the jurisdiction of each such court in any suit, action or proceeding, and (c) waive

any objection which it may have to the laying of venue of any such suit, action or proceeding in any such court.

17.     **No Strict Construction**.  Each party acknowledges that he or it has been represented (or has had the opportunity to be represented) by independent counsel of his or its choice throughout all negotiations that have preceded the execution of this Agreement and that each party has executed the same with consent and upon the advice of said independent counsel.  The parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent arises, this Agreement shall be construed as if drafted jointly by the parties, and no presumption or burden of proof shall arise, or rule of strict construction applied, favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.  Accordingly, any rule of law or any legal decision that would require interpretation of any ambiguities in this Agreement against the party that drafted it, is of no application and is hereby expressly waived by the parties.

18.     **Counterparts and Facsimile Signatures**.  This Agreement may be executed simultaneously in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement, along with any amendments hereto or thereto, to the extent signed and delivered by means of e-mail, a facsimile machine or other means of electronic transmission, shall be treated in all manner and respects and for all purposes as an original signature, agreement or amendment and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

19.     **WAIVER OF JURY TRIAL**.  CONSULTANT AND THE COMPANY, HAVING BEEN REPRESENTED BY COUNSEL OR HAVING THE OPPORTUNITY TO BE REPRESENTED BY COUNSEL, EACH KNOWINGLY AND VOLUNTARILY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

[Signature Page Follows]

The parties have executed this Agreement as of the Effective Date.

**THE COMPANY:**

**ETERNUS BIOSCIENCES, LLC**, a Florida limited liability company

By: _____

Name: Jacob J. Miguel

Title: Manager

**CONSULTANT:**

_____

Rafael Gonzalez, PhD

6

# EXHIBIT C

*March 17, 2023 Membership Interest*
*Purchase Agreement ("MIPA")*
*Signed by Brian Pla and Jacob Miguel*

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

**THIS MEMBERSHIP INTEREST PURCHASE AGREEMENT** ("Agreement") is entered into as of March 17, 2023, by and among CELLEXO, LLC, a Florida limited liability company ("Seller"), SEMPER IUVENIS LLC, a Florida limited liability company ("Buyer"), BRIAN PLA, individually ("Pla"), BLUE ZONE HOLDINGS, LLC, a Florida limited liability company (the "Holding Company"), ETERNUS BIOSCIENCES, LLC, a Florida limited liability company ("Eternus"), and NUGENTERA, LLC, a Florida limited liability company ("NuGentera"). Buyer and Pla may hereinafter be referred to collectively as the "Buyer Parties." The Holding Company, Eternus and NuGentera may hereinafter be referred to collectively as the "Company Parties." Buyer, Seller and the Company Parties, as the context requires, may hereinafter be referred to individually as a "Party" and collectively as the "Parties."

## RECITALS

**WHEREAS**, Seller and Buyer were owners, on a collective basis, of 100% of the membership interests in the Holding Company;

**WHEREAS**, the Holding Company owns 100% of the membership interests in Eternus and NuGentera, respectively;

**WHEREAS**, on October 14, 2022, pursuant to the terms and conditions set forth in that certain Membership Interest Pledge Agreement dated as of June 16, 2022 by and among Buyer, Seller and Eternus, Seller foreclosed on a pledge of Buyer's 49% membership interest in the Holding Company as a result of a default by Buyer under that certain Secured Promissory Note dated June 16, 2022 in the original principal amount of $137,439.03 executed by Buyer and Pla in favor of Eternus (the "Promissory Note"), in full satisfaction of the Promissory Note, which caused Seller to become the 100% owner of the Holding Company; and

**WHEREAS**, upon the terms and conditions of this Agreement, Seller desires to sell, convey, assign, transfer and deliver to Buyer, and Buyer desires to purchase, acquire and accept from Seller, one hundred percent (100%) of the issued and outstanding membership interests in the Holding Company held in Seller's name (the "Interest"), which equals 100% of the issued and outstanding membership interest in the Holding Company.

**NOW, THEREFORE,** for the consideration set forth herein, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## AGREEMENT

In consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties agree as follows:

Section 1.      Definitions.

"Agreement" has the meaning set forth in the preamble above.

"Assignment of Intellectual Property" has the meaning set forth in Section 2(e) below.

"Business Day" means any day of the week other than a Saturday, a Sunday or any day when banks are closed in Miami, Florida.

1

"Buyer" has the meaning set forth in the preamble above.

"Buyer Indemnified Parties" has the meaning set forth in Section 6(b).

"Buyer Parties" has the meaning set forth in the preamble above.

"CIM" has the meaning set forth in Section 2(e) below.

"Closing" has the meaning set forth in Section 2(h) below.

"Closing Date" has the meaning set forth in Section 2(h) below.

"Closing Payment" has the meaning set forth in Section 2(d) below.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company Parties" has the meaning set forth in the preamble above.

"Eternus" has the meaning set forth in the preamble above.

"Holding Company" has the meaning set forth in the preamble above.

"Indemnified Party" has the meaning set forth in Section 6(d)(i) below.

"Indemnifying Party" has the meaning set forth in Section 6(d)(i) below.

"Interest Assignment" has the meaning set forth in Section 2(i)(i)(B) below.

"JSS Research Assignment" has the meaning set forth in Section 2(f) below.

"Liability" or "Liabilities" means any and all actions, causes of action, claims, demands, proceedings, suits, losses, liabilities, damages, penalties, fines, costs and expenses of whatsoever kind and nature (whether known or unknown, whether asserted or unasserted, whether absolute, contingent or a contingency, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including, without limitation, reasonable attorneys' fees.

"Lien" means any and all liabilities, liens, encumbrances, mortgages, security interests, pledges, restrictions and claims of any kind or nature, contingent or otherwise.

"Mutual General Release" has the meaning set forth in Section 2(g).

"NuGentera" has the meaning set forth in the preamble above.

"Party" or "Parties" has the meaning set forth in the preamble above.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, any other business entity, or a governmental entity (or any department, agency, or political subdivision thereof).

"Pla" has the meaning set forth in the preamble above.

"Promissory Note" has the meaning set forth in the third Whereas clause.

2

"Purchase Price" has the meaning set forth in Section 2(b) below.

"Securities Act" has the meaning set forth in Section 3(d)(i).

"Seller" has the meaning set forth in the preamble above.

"Seller Indemnified Parties" has the meaning set forth in Section 6(a).

"Third-Party Claim" has the meaning set forth in Section 6(d)(i) below.

"Transaction Documents" has the meaning set forth in Section 3(a) below.

Section 2.    Basic Transaction.

(a)    Purchase and Sale of the Interest.  Upon the terms and subject to the conditions of this Agreement, at the Closing, Seller shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase, acquire and accept from Seller, the Interest, free and clear of all Liens.

(b)    Purchase Price.  The aggregate purchase price to be paid to Seller in exchange for the Interest shall be US $1,735,000.00 (the "Purchase Price"), payable by Buyer at the Closing as set forth in Section 2(d) hereof.

(c)    Non-Refundable Good Faith Deposit.  The Parties acknowledge and agree that Buyer has made a good faith deposit to Seller of $882,000.00 (the "Good Faith Deposit") to evidence Buyer's good faith intention to purchase the Interest in accordance with the provisions hereof.  The Good Faith Deposit shall be non-refundable; *provided, however,* if Seller breaches this Agreement by failing to assign title to the Interest to Buyer at the Closing and Buyer terminates this Agreement pursuant to Section 7(a)(ii) hereof as a result of such breach, then the Good Faith Deposit shall be refunded to Buyer in full.  At the Closing, the Good Faith Deposit shall be credited against the Purchase Price.

(d)    Payment of the Purchase Price.  At the Closing, Buyer shall pay to Seller an amount equal to the Purchase Price less the Good Faith Deposit (the "Closing Payment") in immediately available funds.

(e)    Eternus Intellectual Property Assignment.  At the Closing, Eternus shall assign all right, title and interest in and to all intellectual property owned or used by Eternus to The CIM Holdings Group, LLC, a Florida limited liability company and affiliate of Seller ("CIM"), by executing an assignment of intellectual property, in the form attached hereto as **Exhibit A** (the "Assignment of Intellectual Property").  The Buyer Parties acknowledge and agree that no consideration, other than the consideration set forth in this Agreement, shall be paid to Eternus or any of the Buyer Parties for the assignment of such intellectual property in Eternus pursuant to this Agreement.

(f)    JSS Research, LLC. At the Closing, Pla shall execute an assignment assigning all right, title, and interest in and to 100% of Pla's membership interest in JSS Research, LLC, a Delaware limited liability company, to Jacob J. Miguel, individually, in the form attached hereto as **Exhibit B** ("JSS Research Assignment").  The Buyer Parties acknowledge and agree that no consideration, other than the consideration set forth in this Agreement, shall be paid to Pla for the assignment of his membership interest in JSS Research pursuant to this Agreement.

3

(g)     Mutual Release.  At the Closing, each of the Buyer Parties, the Company Parties and Seller shall execute (and Seller shall cause Jacob J. Miguel to execute) a mutual general release in the form attached hereto as **Exhibit C** ("Mutual General Release").

(h)     Closing.  The closing of the transactions contemplated by this Agreement (the "Closing") shall occur within three (3) Business Days after the date on which the conditions set forth in Section 5 hereof are satisfied or waived in accordance with the terms of this Agreement (other than those conditions that are to be satisfied by action taken at the Closing, but subject to the satisfaction or waiver of such conditions at the Closing) or at such other time and place as mutually agreed upon by the Parties in writing (as the case may be, the "Closing Date"). The Closing shall be deemed effective as of 11.59 pm Eastern Time on the Closing Date. By agreement of the Parties, the Closing may take place by delivery of documents required to be delivered hereby by facsimile, portable document format, or other electronic transmission, and wire transfer of immediately available funds, all through an escrow process administered by Seller's counsel. All deliveries by one Party to any other Party at the Closing shall be deemed to have occurred simultaneously and none shall be effective until and unless all have occurred.

(i)     Deliveries at Closing.

(i)      At the Closing, Seller shall:

(A)     execute and deliver, as applicable, to Buyer the various certificates, instruments, and agreements referred to in Section 5(a) below; and

(B)     execute and deliver to Buyer an instrument of transfer for the Interest in a form reasonably acceptable to Buyer (the "Interest Assignment").

(ii)     At the Closing, Buyer shall:

(A)     execute and deliver, as applicable, to Seller the various certificates, instruments, and agreements referred to in Section 5(b) below; and

(B)     execute and deliver to Seller the Interest Assignment; and

(C)     deliver to Seller the Closing Payment, by wire transfer of immediately available funds to the account specified in writing by Seller to Buyer prior to the Closing Date.

(j)     Outstanding Eternus Loans.  The Parties acknowledge and agree that upon the consummation of the transactions contemplated by this Agreement, (i) that certain loan from Seller to Eternus in the original principal amount of US $500,000.00, which is (A) evidenced by that certain Amended and Restated Promissory Note dated as of January 28, 2021 executed by Eternus in favor of Seller, (B) secured by a blanket security interest in the assets of Eternus under that certain Security Agreement dated as of January 28, 2021 by and between Seller and Eternus, and (C) guaranteed by Buyer under that certain Corporate Guaranty dated as of January 28, 2021 executed by Buyer in favor of Seller, (ii) that certain loan from Seller to Eternus in the original principal amount of $400,000.00, which is evidenced by that certain Promissory Note dated July 23, 2021 executed by Eternus in favor of Seller and unsecured, and (iii) that certain loan from Seller to Eternus in the original principal amount of $150,000.00, which is evidenced by that certain Promissory Note dated March 15, 2022[1] executed by

---

[1] Jacob, I do not have a copy of this signed promissory note.  Please send it to me. Thanks.

Eternus in favor of Seller and unsecured, will be considered paid in full and that all security agreements, pledge agreements, guarantees, etc. shall be deemed terminated and of no further force or effect. Seller agrees to file UCC-3 Termination Statements within two (2) Business Days following the Closing to terminate all UCC-1 Financing States filed in connection with the above-referenced loans.

Section 3.       Buyer's Representations and Warranties.   The Buyer Parties, jointly and severally, represent and warrant to Seller that the statements contained in this Section 3 are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing (as though made then and as of the Closing were substituted for the date of this Agreement throughout this Section 3).

(a)       Organization of Buyer; Authority; Binding Agreements.   Buyer is a limited liability company duly organized, validly existing, and in active status under the laws of Florida.  Each of the Buyer Parties has full power and authority (including full corporate or other entity power and authority) to execute and deliver this Agreement and all other agreements and instruments to be executed in connection herewith (such other agreements and instruments being hereinafter referred to collectively as the "Transaction Documents") to which the Buyer Parties is a party and to perform their respective obligations hereunder and thereunder.  The execution, delivery and performance by the Buyer Parties of this Agreement and the Transaction Documents to which the Buyer Parties are a party has been duly authorized by all necessary company action on the part of Buyer.  This Agreement has been duly executed and delivered by the Buyer Parties and the other Transaction Documents to which the Buyer Parties is a party will be duly executed and delivered by the Buyer Parties.  This Agreement is a legal, valid, and binding obligation of the Buyer Parties, enforceable against the Buyer Parties in accordance with its terms.  Each of the Transaction Documents to which the Buyer Parties is a party will be duly executed and delivered by the Buyer Parties and will constitute the legal, valid and binding obligations of the Buyer Parties, enforceable against the Buyer Parties in accordance with its terms.

(b)       Non-contravention.   Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which Buyer is subject or any provision of the articles of organization or operating agreement of Seller, or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice (other than notices which may be required under the assigned contracts) under any agreement, contract, lease, license, instrument, or other arrangement to which Buyer is a party or by which either is bound or to which any of either of their assets is subject (or result in the imposition of any lien upon any of its assets).  None of the Buyer Parties need to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order for the parties to consummate the transactions contemplated by this Agreement.

(c)       Brokers' Fees.   None of the Buyer Parties have any Liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which Seller could become liable or obligated.

Section 4.       Seller's Representations and Warranties.  Seller represents and warrants to Buyer that the statements contained in this Section 4 are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing (as though made then and as though the Closing were substituted for the date of this Agreement throughout this Section 4).

(a)       Organization of Seller; Authority; Binding Agreements.   Seller is a limited liability company duly organized, validly existing, and in active status under the laws of Florida.  Seller

has full power and authority (including full corporate or other entity power and authority) to execute and deliver this Agreement and the Transaction Documents to which Seller is a party and to perform its obligations hereunder and thereunder.  The execution, delivery and performance by Seller of this Agreement and the Transaction Documents to which Seller is a party has been duly authorized by all necessary company action on the part of Seller.  This Agreement has been duly executed and delivered by Seller, and the other Transaction Documents to which Seller is a party will be duly executed and delivered by Seller.  This Agreement is a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.  Each of the Transaction Documents to which Seller is a party will be duly executed and delivered by Seller and will constitute the legal, valid and binding obligations of Seller, enforceable against Seller in accordance with its terms.

(b)     Non-contravention.  Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which Seller is subject or any provision of the articles of organization or operating agreement, if any, of Seller or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice (other than notices which may be required under the assigned contracts) under any agreement, contract, lease, license, instrument, or other arrangement to which Seller is a party or by which it is bound or to which any of its assets is subject (or result in the imposition of any lien upon any of its assets).  Other than to the landlord under the lease agreement for the real property leased by Eternus, Seller does not need to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order for the parties to consummate the transactions contemplated by this Agreement.

(c)     Capitalization.  The Interest represents all of the issued and outstanding membership interests of the Holding Company.  The Interest is validly issued and fully paid and was not issued or transferred in violation of any preemptive or similar rights or rights of first refusal or first offer.  Seller owns the Interest, free and clear of any Liens.  There are no membership interests of the Holding Company authorized, reserved, issued or outstanding, and there are no preemptive rights or other outstanding rights, subscriptions, options, warrants, puts, calls, agreements, understandings, claims or other commitments or rights of any type or other securities or obligations with respect thereto (i) convertible or exchangeable into or exercisable for, or giving any Person a right to subscribe for or acquire, any membership interests of the Holding Company, (ii) requiring or giving any Person any rights with respect to the issuance, sale, transfer, repurchase, redemption or other acquisition of any membership interest of the Holding Company, (iii) restricting the transfer of any membership interests of the Holding Company or (iv) relating to the voting of any membership interests of the Holding Company. There is no Liability for, or obligation with respect to, any dividends or distributions declared or accumulated but unpaid with respect to the Interest. Other than Eternus and NuGentera, the Holding Company does not own any membership interests or other equity interests of any other Person.

(d)     Brokers' Fees.  Seller has no Liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which Buyer could become liable or obligated.

Section 5.     Conditions to Obligation to Close.

(a)     Conditions to Buyer's Obligations.  Buyer's obligation to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

6

(i)        the representations and warranties set forth in Section 4 above shall be true and correct in all material respects at and as of the date of this Agreement and at and as of the Closing, except to the extent that such representations and warranties are qualified by the term "material," or contain terms such as "material adverse effect" or "material adverse change," in which case such representations and warranties (as so written, including the term "material" or "Material") shall be true and correct in all respects at and as of the date of this Agreement and at and as of the Closing;

(ii)       Seller shall have performed and complied with all of its covenants hereunder in all material respects through the Closing, except to the extent that such covenants are qualified by the term "material," or contain terms such as "material adverse effect" or "material adverse change," in which case such Seller shall have performed and complied with all of such covenants (as so written, including the term "material" or "Material") in all respects through the Closing;

(iii)      Seller shall have delivered to Buyer a certificate to the effect that each of the conditions specified above in Section 5(a)(i)-(ii) is satisfied in all respects;

(iv)      Seller shall have executed and delivered to Buyer the Interest Assignment;

(v)       Seller and Jacob J. Miguel shall have executed and delivered to the Buyer Parties the Mutual General Release; and

(vi)      Seller shall have delivered to Buyer a certificate of active status for Seller issued on or soon before the Closing Date by the Secretary of State (or comparable officer) of the State of Florida;

(vii)     Seller shall have delivered to Buyer a certificate of the manager of Seller, dated the Closing Date, in form and substance reasonably satisfactory to Buyer, as to: (A) Seller's articles of organization; (B) Seller's operating agreement, if any; and (C) the resolutions of the managers of Seller authorizing the execution, delivery, and performance of this Agreement and the transactions contemplated hereby; and

(viii)    Buyer shall have received at least US $800,000 in financing from Banesco USA to consummate the transaction contemplated by this Agreement.

Buyer may waive any condition specified in this Section 5(a) if it executes a writing so stating at or prior to the Closing.

(b)       <u>Conditions to Seller's Obligation</u>.  The obligation of Seller to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

(i)        the representations and warranties set forth in Section 3 above shall be true and correct in all material respects at and as of the date of this Agreement and at and as of the Closing, the except to the extent that such representations and warranties are qualified by the term "material," or contain terms such as "material adverse effect" or "material adverse change," in which case such representations and warranties (as so written, including the term "material" or "Material") shall be true and correct in all respects at and as of the date of this Agreement and at and as of the Closing;

(ii)     Buyer shall have performed and complied with all of its covenants hereunder in all material respects through the Closing, except to the extent that such covenants are qualified by the term "material," or contain terms such as "material adverse effect" or "material adverse change," in which case Buyer shall have performed and complied with all of such covenants (as so written, including the term "material" or "Material") in all respects through the Closing;

(iii)    Buyer shall each have delivered to Seller a certificate to the effect that each of the conditions specified above in Section 5(b)(i)-(ii) is satisfied in all respects;

(iv)    Eternus shall have executed and delivered to Seller the Assignment of Intellectual Property;

(v)     Pla shall have executed and delivered to Seller the JSS Research Assignment;

(vi)    The Buyer Parties and the Company Parties shall have executed and delivered to Seller the Mutual General Release;

(vii)   Buyer shall have delivered to Seller a certificate of active status for Buyer issued on or soon before the Closing Date by the Secretary of State (or comparable officer) of the State of Florida;

(viii)  Buyer shall have delivered to Seller a certificate of the manager or managing members of Buyer, dated the Closing Date, in form and substance reasonably satisfactory to Seller, as to: (A) Buyer's articles of organization; (B) Buyer's operating agreement, if any; and (C) the resolutions of the managers, managing members or other authorizing body of Buyer authorizing the execution, delivery, and performance of this Agreement and the transactions contemplated hereby.

Seller may waive any condition specified in this Section 5(b) if it executes a writing so stating at or prior to the Closing.

Section 6.      Post-Closing Covenants.  The Parties agree as follows with respect to the period following the Closing:

(a)     General.  In case at any time after the Closing any further actions are necessary to carry out the purposes of this Agreement, each of the Parties will take such further actions (including the execution and delivery of such further instruments and documents) as the other Party may reasonably request, all at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefor under Section 7 below).

(b)     Maintenance of Books and Records.  Seller and Buyer shall cooperate fully with each other after the Closing so that (subject to any limitations that are reasonably required to preserve any applicable attorney-client privilege) each Party has access to the business records, contracts and other information existing on the Closing Date and relating in any manner to the Company Parties or the conduct of the business of the Company Parties.  No files, books or records existing on the Closing Date and relating in any manner to the Company Parties or the conduct of the business of the Company Parties prior to the Closing Date shall be destroyed by any Party for a period of six (6) years after the Closing Date without giving the other party at least thirty (30) days prior written notice, during which time such other Party shall have the right (subject to the provisions hereof) to examine and to remove any such files,

books and records prior to their destruction. The access to files, books and records contemplated by this Section 6(b) shall be during normal business hours and upon not less than two (2) business days prior written request, shall be subject to such reasonable limitations as the Party having custody or control thereof may impose to preserve the confidentiality of information contained therein, and shall not extend to material subject to a claim of privilege unless expressly waived by the Party entitled to claim the same.

(c)     <u>Litigation Support</u>.   In the event and for so long as any Party is actively prosecuting, contesting or defending against any action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand in connection with (i) any transaction contemplated under this Agreement or (ii) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction on or prior to the Closing Date involving Seller, the other Party will cooperate with the contesting or defending Party and its counsel in the contest or defense, make available its personnel, and provide such testimony and access to its books and records as shall be necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending Party (unless the contesting or defending Party is entitled to indemnification therefor under Section 7 below).

(d)     <u>Resignation as Manager and Officer</u>.   At the Closing, (i) Seller shall cause Jacob J. Miguel to resign as a manager and officer of each of the Company Parties, and (ii) upon the execution of such resignation, Pla shall automatically be elected and appointed as the sole manager of the Holding Company, Eternus and NuGentera without any further required action and Pla shall be authorized to execute any and all of the Transaction Documents on behalf of such entities.

Section 7.     <u>Remedies for Breaches of This Agreement</u>.

(a)     <u>Survival of Representations and Warranties</u>.   The representations and warranties of the Buyer Parties contained in Section 3 hereof and the Seller contained in Section 4 hereof shall survive the Closing hereunder and continue in full force and effect indefinitely.

(b)     <u>Indemnification Provisions for Buyer's Benefit</u>.   Seller covenants and agrees to indemnify and hold harmless the Buyer Parties and their respective managers, members, affiliates, agents and representatives (collectively, the "<u>Buyer Indemnified Parties</u>") from and against any and all Liabilities incurred by the Buyer Indemnified Parties arising out of, related to, or in connection with (i) a breach of any representation and warranty of the Seller hereunder or under the Transaction Documents executed hereunder, or (ii) a breach of any covenant of Seller hereunder or under the Transaction Documents executed hereunder.

(c)     <u>Indemnification Provisions for Seller's Benefit</u>.   Each of the Buyer Parties and the Company Parties covenant and agree to, jointly and severally, indemnify and hold harmless Seller and its managers, members, affiliates, agents and representatives, including, without limitation, Jacob J. Miguel (collectively, the "<u>Seller Indemnified Parties</u>"), from and against any and all Liabilities incurred by the Seller Indemnified Parties arising out of, related to, or in connection with (i) any breach of any representation and warranty of the Buyer Parties hereunder or under the Transaction Documents executed hereunder, (ii) a breach of any covenant of any of the Buyer Parties hereunder or under the Transaction Documents executed hereunder, and (iii) the operation of Eternus and NuGentera, including any Liabilities and/or obligations of Eternus and NuGentera, whether arising prior to, on or after the date of this Agreement, including, without limitation, any Liabilities incurred by the Seller Indemnified Parties with respect to that certain lawsuit by ITRIA Ventures, LLC, Case No. 2020-016558-CA 09.

(d)     <u>Matters Involving Third Parties</u>.

(i)    If any third party notifies any Party (the "<u>Indemnified Party</u>") with respect to any matter (a "<u>Third-Party Claim</u>") that may give rise to a claim for indemnification against any other Party (the "<u>Indemnifying Party</u>") under this Section 6, then the Indemnified Party shall promptly notify the Indemnifying Party thereof in writing; *provided, however*, that no delay on the part of the Indemnified Party in notifying any Indemnifying Party shall relieve the Indemnifying Party from any obligation hereunder unless (and then solely to the extent) the Indemnifying Party is thereby prejudiced.

(ii)    The Indemnifying Party will have the right to defend the Indemnified Party against the Third-Party Claim with counsel of its choice satisfactory to the Indemnified Party so long as (A) the Indemnifying Party notifies the Indemnified Party in writing within twenty (20) days after the Indemnified Party has given notice of the Third-Party Claim that the Indemnifying Party will indemnify the Indemnified Party from and against the entirety of any Liabilities the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third-Party Claim, (B) the Indemnifying Party provides the Indemnified Party with evidence acceptable to the Indemnified Party that the Indemnifying Party will have the financial resources to defend against the Third-Party Claim and fulfill its indemnification obligations hereunder, (C) the Third-Party Claim involves only money damages and does not seek an injunction or other equitable relief, (D) settlement of, or an adverse judgment with respect to, the Third-Party Claim is not, in the good faith judgment of the Indemnified Party, likely to establish a precedential custom or practice adverse to the continuing business interests or the reputation of the Indemnified Party, and (E) the Indemnifying Party conducts the defense of the Third-Party Claim actively and diligently.

(iii)    So long as the Indemnifying Party is conducting the defense of the Third-Party Claim in accordance with Section 6(d)(ii) above, (A) the Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third-Party Claim, (B) the Indemnified Party will not consent to the entry of any judgment on or enter into any settlement with respect to the Third-Party Claim without the prior written consent of the Indemnifying Party (not to be unreasonably withheld or delayed), and (C) the Indemnifying Party will not consent to the entry of any judgment on or enter into any settlement with respect to the Third-Party Claim without the prior written consent of the Indemnified Party (not to be unreasonably withheld or delayed).

(iv)    In the event any of the conditions in Section 6(d)(ii) above is or becomes unsatisfied, however, (A) the Indemnified Party may defend against, and consent to the entry of any judgment on or enter into any settlement with respect to, the Third-Party Claim in any manner it may deem appropriate (and the Indemnified Party need not consult with, or obtain any consent from, any Indemnifying Party in connection therewith), (B) the Indemnifying Parties will reimburse the Indemnified Party promptly and periodically for the costs of defending against the Third-Party Claim (including attorneys' fees and expenses), and (C) the Indemnifying Parties will remain responsible for any Liabilities the Indemnified Party may suffer resulting from, arising out of, relating to, in the nature of, or caused by the Third-Party Claim to the fullest extent provided in this Section 6.

(e)    <u>Adjustment to Purchase Price</u>.  All indemnification payments under this Section 6 shall be deemed adjustments to the Purchase Price.

(f)    <u>Exclusive Remedies; Other Indemnification Provisions</u>.  The remedies provided in this Section 6 constitute the sole and exclusive remedies available to each Party hereto for recoveries against another Party hereto for breaches or failures to comply with or non-fulfillment of the

representations, warranties, covenants and agreements in this Agreement, except that nothing in this Agreement shall limit the right of any Party to pursue any appropriate remedy at equity or any appropriate remedy based upon allegations of fraud in connection with this Agreement.

Section 8.      Termination.

(a)      Termination of Agreement.  Certain of the Parties may terminate this Agreement as provided below:

(i)      Buyer and Seller may terminate this Agreement by mutual written consent at any time prior to the Closing without the consent of any of the Company Parties;

(ii)      Buyer may terminate this Agreement by giving written notice to Seller at any time prior to the Closing (A) in the event Seller has breached any material representation, warranty, or covenant contained in this Agreement in any material respect, Buyer has notified Seller of the breach, and the breach has continued without cure for a period of ten (10) days after the notice of breach, or (B) if the Closing shall not have occurred on or before April 17, 2023, by reason of the failure of any condition precedent under Section 5(a) hereof (unless the failure results primarily from Buyer itself breaching any representation, warranty, or covenant contained in this Agreement); and

(iii)      Seller may terminate this Agreement by giving written notice to Buyer at any time prior to the Closing (A) in the event Buyer has breached any material representation, warranty, or covenant contained in this Agreement in any material respect, Seller has notified Buyer of the breach, and the breach has continued without cure for a period of ten (10) days after the notice of breach, or (B) if the Closing shall not have occurred on or before April 17, 2023, by reason of the failure of any condition precedent under Section 5(b) hereof (unless the failure results primarily from Seller breaching any representation, warranty, or covenant contained in this Agreement).

(b)      Effect of Termination.  If any Party terminates this Agreement pursuant to Section 7(a) above, all rights and obligations of the Parties hereunder shall terminate without any Liability of any Party to any other Party (except for any Liability of any Party then in breach).

Section 9.      General Provisions.

(a)      Press Releases and Public Announcements.  Neither Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement without the prior written approval of the other Party.

(b)      No Third-Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

(c)      Entire Agreement.  This Agreement (including the documents referred to herein) constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof, including, without limitation, that certain Asset Purchase Agreement dated as of January 6, 2023 by and among Buyer, Pla, Gentera Management Consulting, LLC and Seller, as amended by that certain First Amendment dated as of February 3, 2023.

(d)     <u>Succession and Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of Buyer and Seller.

(e)     <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts (including by means of facsimile or PDF), each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

(f)     <u>Headings</u>.  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

(g)     <u>Notices</u>.  All notices, requests, demands, claims, and other communications hereunder shall be in writing. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient or by electronic mail, (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), or (iii) four (4) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

(i)     if to Seller, to:

Cellexo, LLC
6619 S. Dixie Highway, Suite 391
Miami, FL  33143
Attn: Jacob J. Miguel, Manager
Email: jacobjmig@gmail.com

(ii)    if to Buyer or any of the Company Parties, to:

Semper Iuvenis, LLC
6619 S. Dixie Highway, Suite 210
Miami, FL  33143
Attn: Brian Pla, Managing Member
Email: brian@genteramed.com

Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth.

(h)     <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Florida without giving effect to any choice or conflict of law provision or rule (whether of the State of Florida or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Florida.

(i)     <u>Amendments and Waivers</u>.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer and Seller. No waiver by any Party of any provision of this Agreement or any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such default, misrepresentation, or breach of warranty or covenant.

(j)     Severability.    Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

(k)     Expenses.  Each of Buyer, Seller and the Company Parties shall each bear their own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

(l)     Construction.    The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation. The Parties intend that each representation, warranty, and covenant contained herein shall have independent significance.  If any Party has breached any representation, warranty, or covenant contained herein in any respect, the fact that there exists another representation, warranty, or covenant relating to the same subject matter (regardless of the relative levels of specificity) that the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, or covenant.

(m)     Incorporation of Exhibits.    The Exhibits identified in this Agreement are incorporated herein by reference and made a part hereof.

(n)     Submission to Jurisdiction.  Each of the Parties submits to the jurisdiction of any state or federal court sitting in Miami-Dade County, Florida, in any action or proceeding arising out of or relating to this Agreement and agrees that all claims in respect of the action or proceeding may be heard and determined in any such court. Each Party also agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court. Each of the Parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety, or other security that might be required of any other Party with respect thereto.  Each Party agrees that a final judgment in any action or proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by law or at equity.

[Signature Page Follows]

The Parties have executed this Agreement as of the date first above written.

**SELLER:**

**CELLEXO, LLC**, a Florida limited liability company

By
Name: Jacob J. Miguel
Title: Manager

**BUYER PARTIES:**

**SEMPER IUVENIS, LLC.**, a Florida limited liability company

By:
Name: Brian Pla
Title: Managing Member

**PLA:**

Brian Pla, individually

**COMPANY PARTIES:**

**BLUE ZONE HOLDINGS, LLC**, a Florida limited liability company

By:
Name: Jacob J. Miguel
Title: Manager

**ETERNUS BIOSCIENCES, LLC**, a Florida limited liability company

By:
Name: Jacob J. Miguel
Title: Manager

14

NUGENTERA, LLC, a Florida limited liability company

By:
Name: Jacob J. Miguel
Title: Manager

15

**EXHIBIT A**

**<u>FORM OF ASSIGNMENT OF INTELLECTUAL PROPERTY</u>**

(See Attached)

## ASSIGNMENT OF INTELLECTUAL PROPERTY

**THIS ASSIGNMENT OF INTELLECTUAL PROPERTY** (this "Assignment"), dated as of _____, 2023 ("Effective Date"), is executed by ETERNUS BIOSCIENCES, LLC, a Florida limited liability company ("Assignor"), in favor of THE CIM HOLDINGS GROUP, LLC, a Florida limited liability company ("Assignee").

WHEREAS, Assignor is a party to a certain Membership Interest Purchase Agreement dated as of _____, 2023 by and among CELLEXO, LLC, a Florida limited liability company ("Seller"), SEMPER IUVENIS LLC, a Florida limited liability company ("Buyer"), BRIAN PLA, individually, BLUE ZONE HOLDINGS, LLC, a Florida limited liability company, Assignor, and NUGENTERA, LLC, a Florida limited liability company (the "Purchase Agreement"); and

WHEREAS, pursuant to Section 2(e) of the Purchase Agreement, Assignor is required to execute this Agreement in favor of Assignee.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Definition of Intellectual Property.   "Intellectual Property" means all of the following owned or licensed by Assignor, in any jurisdiction throughout the world: (i) all trademarks (registered or unregistered), service marks, brand names, trade names, domain names, certification marks, trade dress, assumed names, other indications of origin and the goodwill associated therewith, and all registrations or applications for registration thereof in any jurisdiction, including any extension, modification or renewal of any such registration or application other than (A) the trade name "Eternus Biosciences" or any logos associated therewith, and (B) the eternusbiosciences.com domain name; (ii) all patents, patent applications, continuations, continuations-in-part, divisionals and foreign counterparts in any jurisdiction; (iii) all copyrights, database rights and moral rights in both published works and unpublished works, including all such rights in software, user and training manuals, marketing and promotional materials, internal reports, business plans and any other writings, expressions, mask works, firmware and videos, whether copyrighted, copyrightable or not, and all registrations or applications for registration of copyrights thereof and any renewals or extensions thereof in any jurisdiction other than copyrighted text on the eternusbiosciences.com website related to Assignor; (iv) trade secret and confidential information, and rights in any jurisdiction to limit the use or disclosure thereof by a third party, including such rights in inventions, discoveries and ideas, whether patented, patentable or not in any jurisdiction (and whether or not reduced to practice), know-how, technical information, proprietary information, technologies, processes and formulae, software, data, plans, drawings and blue prints, whether tangible or intangible and whether stored, compiled, or memorialized physically, electronically, photographically or otherwise; and (v) any similar intellectual property or proprietary rights similar to any of the foregoing, licenses, immunities, covenants not to sue and the like relating to the foregoing, and any claims or causes of action arising out of or related to any infringement, misuse or misappropriation of any of the foregoing.

2.    Assignment of Intellectual Property.  Assignor does hereby assign, grant, sell, transfer and deliver to Assignee, and Assignee does hereby purchase, acquire and accept, Assignee's full, exclusive and entire right, title, and interest in and to the Intellectual Property, including any and all (i) licenses and sublicenses granted and obtained with respect thereto, (ii) rights thereunder, (iii) rights to protection of interests therein under the laws of all jurisdictions, (iv) associated rights for past, present and future income, royalties or other payment with respect thereto, (v) associated rights to sue for any past, present and future damages in relation to any infringement or misappropriation thereof, and (vi) associated goodwill.  To the extent the foregoing assignment is ineffective for any reason, Assignor hereby grants to Assignee the

exclusive, royalty-free, fully paid-up, irrevocable, perpetual, transferable, worldwide right and license (including the right to sublicense through multiple tiers of sublicensees) to make, reproduce, perform, display, modify, create derivative works of, use, sell and otherwise exploit, protect and enforce the Intellectual Property. In addition, Assignor hereby irrevocably and perpetually waives all rights, including, without limitation, all patent rights, copyrights, trademark rights, mask work rights, and moral rights, not owned by, assigned to or licensed to Assignee that Assignor may have in or to the Intellectual Property, and hereby covenants not to bring or participate in any action against Assignee or its successor in interest for infringement of such rights.

3.    Further Assurances; Delivery of Documentation.  Whenever Assignor is requested to do so by Assignee or its successor in interest, Assignor shall execute any and all applications, assignments, and other instruments which Assignee or its successor in interest deems necessary to apply for and obtain a patent or other registration for the Intellectual Property in the United States and any other foreign country and to protect by patent, trademark, copyright, or otherwise Assignee's interests in any of the Intellectual Property. Assignor agrees to assist Assignee, upon Assignee's reasonable request and at Assignee's sole expense (subject to the indemnification provisions of the Contribution Agreement), in any pending or threatened suits or actions by third parties challenging the validity or enforceability of any Intellectual Property to the extent such assistance is reasonably required to effectively defend such suits or actions, but only to the extent practicably practicable. To the extent that Assignor is in possession or control of any documentation (in whatever form or medium, including electronic media), which relates to the Intellectual Property, and which is not in the possession of Assignee as of the Effective Date, Assignor shall transfer such documentation to Assignee promptly following the Closing.

4.    Successors and Assigns.  Assignor hereby acknowledges that the terms and provisions of this Assignment and the respective rights and obligations of Assignor and rights of Assignee hereunder shall be binding upon, and inure to the benefit of, their respective successors and assigns.

5.    Recordings.  Assignor hereby acknowledges that an executed copy of this Assignment may be filed with the United States Patent and Trademark Office, the United States Copyright Office or with the intellectual property authority of any other country or region, as applicable, by Assignee or its successor in interest at any time.

6.    Governing Law.  The provisions of this Assignment shall be governed and interpreted in all respects pursuant to the substantive laws of the State of Florida without regard to its conflict of laws principles.

[Signature Page Follows]

2

The undersigned have caused this Assignment to be executed and delivered on the day and year first written above.

ASSIGNOR:

**ETERNUS BIOSCIENCES, LLC**, a Florida limited liability company

By: _____
Name: Brian Pla
Title: Manager

ASSIGNEE:

**THE CIM HOLDINGS GROUP, LLC**, a Florida limited liability company

By: _____
Name: Jacob J. Miguel
Title: Manager

**EXHIBIT B**

**<u>FORM OF JSS RESEARCH ASSIGNMENT</u>**

(See Attached)

**ASSIGNMENT**

BE IT KNOWN, for value received, BRIAN PLA, an individual ("Assignor"), hereby assigns, transfers, delivers and sets over unto, JACOB J. MIGUEL, an individual ("Assignee"), all right, title and interest in and to 100% of the membership interest in JSS RESEARCH, LLC, a Delaware limited liability company (the "Company"), held in Assignor's name (the "Membership Interest"), which equals five percent (5%) of the issued and outstanding membership interests of the Company, effective as of the Effective Date (as defined below).

The undersigned represents and warrants that the Membership Interest assigned hereunder is free and clear of any and all liens, encumbrances, security interests, pledges, options, mortgages, equities or other similar interests.

This assignment shall be binding upon and inure to the benefit of the parties hereto and their successors and assigns.

IN WITNESS WHEREOF, the parties hereto have executed this Assignment on _____, 2023 ("Effective Date").

**Assignor:**                                          **Assignee:**


_____          _____
Brian Pla, individually                            Jacob J. Miguel, individually


**COMPANY'S ACCEPTANCE OF ASSIGNMENT**

The foregoing Assignment has been accepted by the Company, and same shall be given due effect on the Company's books and records as of the Effective Date.

**JSS RESEARCH, LLC**, a Florida limited liability company


By: _____
Name: Jacob J. Miguel
Title: Manager

**EXHIBIT C**

**<u>MUTUAL GENERAL RELEASE</u>**

(See Attached)

**MUTUAL GENERAL RELEASE**

Pursuant to Section 2(g) of that certain Membership Interest Purchase Agreement, dated as of

_____, 2023 (the "<u>Membership Interest Purchase Agreement</u>"), by and among CELLEXO, LLC,

a Florida limited liability company ("<u>Seller</u>"), SEMPER IUVENIS LLC, a Florida limited liability

company ("<u>Buyer</u>"), BRIAN PLA, individually ("<u>Pla</u>"), BLUE ZONE HOLDINGS, LLC, a Florida

limited liability company (the "<u>Holding Company</u>"), ETERNUS BIOSCIENCES, LLC, a Florida limited

liability company ("<u>Eternus</u>"), and NUGENTERA, LLC, a Florida limited liability company

("<u>Nugentera</u>"), and for good and valuable consideration, the receipt of which is hereby acknowledged,

each of Seller, Buyer, Pla, the Holding Company, Eternus, NuGentera and Jacob J. Miguel ("<u>Miguel</u>")

agree as follows:

       1.     **<u>Release from the Company Parties</u>**.  The Company Parties (as defined below) for and

on behalf of themselves and their respective managers, members, employees, affiliates, subsidiaries

(direct and indirect), representatives, agents, heirs and assigns (collectively, the "<u>Company Releasing</u>

<u>Parties</u>"), hereby agree to and do irrevocably release and forever discharge the Seller and its managers,

members, employees, affiliates, subsidiaries (direct and indirect), representatives, agents, heirs and

assigns, including, without limitation, Miguel (collectively, the "<u>Seller Released Parties</u>"), from any and

all manner of actions, causes of action, claims, offsets, demands, judgments, complaints, executions,

regulatory challenges, losses, damages, expenses, fees, debts, representations, warranties or liabilities of

any kind whatsoever, whether arising out of state, federal or foreign law, rule, regulation or equity,

whether known or unknown, accrued or not accrued, asserted or not asserted, matured or not matured,

suspected or not suspected, fixed or contingent, foreseeable or unforeseeable, direct or indirect (each, a

"<u>Claim</u>", and collectively, "<u>Claims</u>"), which the Company Releasing Parties ever had, now have or

hereafter can, shall or may have or acquire against the Seller Released Parties or any of them, by reason

of any and all facts, circumstances, transactions, events, statements, representations, warranties,

occurrences, acts, or omissions (whether or not knowingly, intentional, reckless or negligent; whether or

not based on, due to or resulting from solely the conduct, action, activity, omission or fault of one or more

of the Seller Released Parties; and with or without any conduct, action, activity, omission or fault of the

Company Releasing Parties), which occurred, arose or existed at any time on or before the date of this Mutual General Release (collectively, the "Company Released Claims"); *provided, however*, that the foregoing release shall not apply to (i) any rights of the Company Releasing Parties under this Mutual General Release, or (ii) any claim of fraud against the Seller Released Parties. The Company Releasing Parties do hereby now and forever, (i) covenant and agree not to sue the Seller Released Parties and to refrain forever from instituting, pursuing, pressing, collecting, or and in any way aiding or proceeding upon any and all of the Company Released Claims, and (ii) waive any and all future Company Released Claims they now have, might have or hereafter can have against the Seller Released Parties.  This covenant not to sue shall serve as a bar to any attempted proceeding by the Company Releasing Parties against the Seller Released Parties for any Company Released Claims.

2. **Release from the Buyer Parties**.  The Buyer Parties (as defined below) for and on behalf of themselves and their respective managers, members, employees, affiliates, subsidiaries (direct and indirect), representatives, agents, heirs and assigns (collectively, the "Buyer Releasing Parties"), hereby agree to and do irrevocably release and forever discharge the Seller Released Parties, from any and all Claims, which the Buyer Releasing Parties ever had, now have or hereafter can, shall or may have or acquire against the Seller Released Parties or any of them, by reason of any and all facts, circumstances, transactions, events, statements, representations, warranties, occurrences, acts, or omissions (whether or not knowingly, intentional, reckless or negligent; whether or not based on, due to or resulting from solely the conduct, action, activity, omission or fault of one or more of the Seller Released Parties; and with or without any conduct, action, activity, omission or fault of the Buyer Releasing Parties), which occurred, arose or existed at any time on or before the date of this Mutual General Release (collectively, the "Buyer Released Claims"); *provided, however*, that the foregoing release shall not apply to (i) any rights of the Buyer Releasing Parties under this Mutual General Release, (ii) any claim for indemnification under the Membership Interest Purchase Agreement or any Transaction Document executed in connection therewith, or (iii) any claim of fraud against the Seller Released Parties arising under or related to the Membership Interest Purchase Agreement or any Transaction Document executed in connection therewith. The Buyer Releasing Parties do hereby now and forever, (i) covenant

2

and agree not to sue the Seller Released Parties and to refrain forever from instituting, pursuing, pressing, collecting, or and in any way aiding or proceeding upon any and all of the Buyer Released Claims, and (ii) waive any and all future Buyer Released Claims they now have, might have or hereafter can have against the Seller Released Parties.  This covenant not to sue shall serve as a bar to any attempted proceeding by the Buyer Releasing Parties against the Seller Released Parties for any Buyer Released Claims.

      3.    **<u>Release from the Seller Parties</u>**.  The Seller Parties (as defined below), for and on behalf of themselves and their respective managers, members, employees, affiliates, representatives, agents and assigns (collectively, the "<u>Seller Releasing Parties</u>"), hereby agree to and do irrevocably release and forever discharge the Buyer Parties and the Company Parties and their respective managers, members, employees, affiliates, representatives, agents, heirs and assigns (collectively, the "<u>Buyer Released Parties</u>") from any and all Claims, which the Seller Releasing Parties ever had, now have or hereafter can, shall or may have or acquire against the Buyer Released Parties or any of them, by reason of any and all facts, circumstances, transactions, events, statements, representations, warranties, occurrences, acts, or omissions (whether or not knowingly, intentional, reckless or negligent; whether or not based on, due to or resulting from solely the conduct, action, activity, omission or fault of one or more of the Buyer Released Parties; and with or without any conduct, action, activity, omission or fault of the Seller Releasing Parties), which occurred, arose or existed at any time on or before the date of this Mutual General Release (collectively, the "<u>Seller Released Claims</u>"); *provided, however*, that the foregoing release shall not apply to (i) any rights of the Seller Releasing Parties under this Mutual General Release, (ii) any claim for indemnification under the Membership Interest Purchase Agreement or any Transaction Document executed in connection therewith, or (ii) any claim of fraud against the Buyer Released Parties arising under or related to the Membership Interest Purchase Agreement or any Transaction Document executed in connection therewith. The Seller Releasing Parties do hereby now and forever, covenant and agree not to sue the Buyer Released Parties and to refrain forever from instituting, pursuing, pressing, collecting, or and in any way aiding or proceeding upon any and all of the Seller Released Claims.  This

covenant not to sue shall serve as a bar to any attempted proceeding by the Seller Releasing Parties against the Buyer Released Parties for any Seller Released Claims.

    4.    **Acknowledgements.**  Each of parties hereto hereby acknowledge and agree to the following:

    (a)    This Mutual General Release is given solely in exchange for the consideration set forth in the Membership Interest Purchase Agreement and hereunder, and such consideration is in addition to anything of value to which Seller, Buyer or the Company Parties received prior to entering into the Membership Interest Purchase Agreement and this Mutual General Release;

    (b)    By entering into this Mutual General Release, Seller, Buyer and the Company Parties has had a reasonable time to consider this Mutual General Release and it understands it; and

    (c)    Each of Seller, Buyer and the Company Parties has been advised to consult an attorney prior to entering into this Mutual General Release.

    5.    **Definitions**.

    (a)    Capitalized terms not otherwise defined herein shall have the meanings given to them under the Membership Interest Purchase Agreement.

    (b)    For the purposes hereof, the term "Company Parties" means the Holding Company, Eternus, NuGentera and their respective affiliates, successors and assigns.

    (c)    For the purposes hereof, the term "Buyer Parties" means Buyer and Pla and their respective heirs, representatives, affiliates, successors and assigns.

    (d)    For the purposes hereof, the term "Seller Parties" means Seller and Miguel and their respective heirs, representatives, affiliates, successors and assigns.

    6.    **General**.  Each of the parties hereto represents and warrants that the person executing on behalf of such party has been duly authorized to execute this Mutual General Release.  This Mutual General Release shall be governed by and construed in accordance with the law of the State of Florida and may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument.

The undersigned have executed this Mutual General Release as of _____, 2023.

**COMPANY PARTIES:**

**BLUE ZONE HOLDINGS, LLC**, a Florida limited liability company


By:_____
Name: Brian Pla
Title: Manager


**ETERNUS BIOSCIENCES, LLC**, a Florida limited liability company


By:_____
Name: Brian Pla
Title: Manager


**NUGENTERA, LLC**, a Florida limited liability company


By:_____
Name: Brian Pla
Title: Manager


**BUYER PARTIES:**

**SEMPER IUVENIS LLC**, a Florida limited liability company


By:_____
Name: Brian Pla
Title: Managing Member


**PLA:**


_____
Brian Pla, individually

5

**SELLER PARTIES:**

**CELLEXO, LLC**, a Florida limited liability company

By:_____
Name: Jacob J. Miguel
Title: Manager

**MIGUEL:**

_____
Jacob J. Miguel, individually

# EXHIBIT D

*April 18, 2023 Assignment of Intellectual Property Agreement signed by Brian Pla and Jacob Miguel*

## ASSIGNMENT OF INTELLECTUAL PROPERTY

**THIS ASSIGNMENT OF INTELLECTUAL PROPERTY** (this "Assignment"), dated as of _____, 2023 ("Effective Date"), is executed by ETERNUS BIOSCIENCES, LLC, a Florida limited liability company ("Assignor"), in favor of THE CIM HOLDINGS GROUP, LLC, a Florida limited liability company ("Assignee").

WHEREAS, Assignor is a party to a certain Membership Interest Purchase Agreement dated as of March 17, 2023 by and among CELLEXO, LLC, a Florida limited liability company ("Seller"), SEMPER IUVENIS LLC, a Florida limited liability company ("Buyer"), BRIAN PLA, individually, BLUE ZONE HOLDINGS, LLC, a Florida limited liability company, Assignor, and NUGENTERA, LLC, a Florida limited liability company (the "Purchase Agreement"); and

WHEREAS, pursuant to Section 2(e) of the Purchase Agreement, Assignor is required to execute this Agreement in favor of Assignee.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Definition of Intellectual Property.  "Intellectual Property" means all of the following owned or licensed by Assignor, in any jurisdiction throughout the world: (i) all trademarks (registered or unregistered), service marks, brand names, trade names, domain names, certification marks, trade dress, assumed names, other indications of origin and the goodwill associated therewith, and all registrations or applications for registration thereof in any jurisdiction, including any extension, modification or renewal of any such registration or application other than (A) the trade name "Eternus Biosciences" or any logos associated therewith, and (B) the eternusbiosciences.com domain name; (ii) all patents, patent applications, continuations, continuations-in-part, divisionals and foreign counterparts in any jurisdiction; (iii) all copyrights, database rights and moral rights in both published works and unpublished works, including all such rights in software, user and training manuals, marketing and promotional materials, internal reports, business plans and any other writings, expressions, mask works, firmware and videos, whether copyrighted, copyrightable or not, and all registrations or applications for registration of copyrights thereof and any renewals or extensions thereof in any jurisdiction other than copyrighted text on the eternusbiosciences.com website related to Assignor; (iv) trade secret and confidential information, and rights in any jurisdiction to limit the use or disclosure thereof by a third party, including such rights in inventions, discoveries and ideas, whether patented, patentable or not in any jurisdiction (and whether or not reduced to practice), know-how, technical information, proprietary information, technologies, processes and formulae, software, data, plans, drawings and blue prints, whether tangible or intangible and whether stored, compiled, or memorialized physically, electronically, photographically or otherwise; and (v) any similar intellectual property or proprietary rights similar to any of the foregoing, licenses, immunities, covenants not to sue and the like relating to the foregoing, and any claims or causes of action arising out of or related to any infringement, misuse or misappropriation of any of the foregoing.

2.      Assignment of Intellectual Property.  Assignor does hereby assign, grant, sell, transfer and deliver to Assignee, and Assignee does hereby purchase, acquire and accept, Assignee's full, exclusive and entire right, title, and interest in and to the Intellectual Property, including any and all (i) licenses and sublicenses granted and obtained with respect thereto, (ii) rights thereunder, (iii) rights to protection of interests therein under the laws of all jurisdictions, (iv) associated rights for past, present and future income, royalties or other payment with respect thereto, (v) associated rights to sue for any past, present and future damages in relation to any infringement or misappropriation thereof, and (vi) associated goodwill.  To the extent the foregoing assignment is ineffective for any reason, Assignor hereby grants to Assignee the

exclusive, royalty-free, fully paid-up, irrevocable, perpetual, transferable, worldwide right and license (including the right to sublicense through multiple tiers of sublicensees) to make, reproduce, perform, display, modify, create derivative works of, use, sell and otherwise exploit, protect and enforce the Intellectual Property.  In addition, Assignor hereby irrevocably and perpetually waives all rights, including, without limitation, all patent rights, copyrights, trademark rights, mask work rights, and moral rights, not owned by, assigned to or licensed to Assignee that Assignor may have in or to the Intellectual Property, and hereby covenants not to bring or participate in any action against Assignee or its successor in interest for infringement of such rights.

3.      <u>Further Assurances; Delivery of Documentation</u>.  Whenever Assignor is requested to do so by Assignee or its successor in interest, Assignor shall execute any and all applications, assignments, and other instruments which Assignee or its successor in interest deems necessary to apply for and obtain a patent or other registration for the Intellectual Property in the United States and any other foreign country and to protect by patent, trademark, copyright, or otherwise Assignee's interests in any of the Intellectual Property.  Assignor agrees to assist Assignee, upon Assignee's reasonable request and at Assignee's sole expense (subject to the indemnification provisions of the Contribution Agreement), in any pending or threatened suits or actions by third parties challenging the validity or enforceability of any Intellectual Property to the extent such assistance is reasonably required to effectively defend such suits or actions, but only to the extent practicably practicable.  To the extent that Assignor is in possession or control of any documentation (in whatever form or medium, including electronic media), which relates to the Intellectual Property, and which is not in the possession of Assignee as of the Effective Date, Assignor shall transfer such documentation to Assignee promptly following the Closing.

4.      <u>Successors and Assigns</u>.  Assignor hereby acknowledges that the terms and provisions of this Assignment and the respective rights and obligations of Assignor and of rights of Assignee hereunder shall be binding upon, and inure to the benefit of, their respective successors and assigns.

5.      <u>Recordings</u>.  Assignor hereby acknowledges that an executed copy of this Assignment may be filed with the United States Patent and Trademark Office, the United States Copyright Office or with the intellectual property authority of any other country or region, as applicable, by Assignee or its successor in interest at any time.

6.      <u>Governing Law</u>.  The provisions of this Assignment shall be governed and interpreted in all respects pursuant to the substantive laws of the State of Florida without regard to its conflict of laws principles.

[Signature Page Follows]

The undersigned have caused this Assignment to be executed and delivered on the day and year first written above.

**ASSIGNOR:**

**ETERNUS BIOSCIENCES, LLC**, a Florida limited liability company

By:_____
Name: Brian Pla
Title: Manager

**ASSIGNEE:**

**THE CIM HOLDINGS GROUP, LLC**, a Florida limited liability company

By:_____
Name: Jacob J. Miguel
Title: Manager

3

The undersigned have caused this Assignment to be executed and delivered on the day and year first written above.

**ASSIGNOR:**

**ETERNUS BIOSCIENCES, LLC**, a Florida limited liability company

By:_____

Name: Brian Pla

Title: Manager

**ASSIGNEE:**

**THE CIM HOLDINGS GROUP, LLC**, a Florida limited liability company

By:_____

Name: Jacob J. Miguel

Title: Manager

3